OPINION OF THE COURT
Sondra Miller, J.
In this child abuse proceeding, the Commissioner of Social Services (CSS) alleged that respondent, Lori Z., intentionally inflicted physical injury upon her infant daughter, Jessica (born Nov. 10, 1985), creating a substantial risk of death, disfigurement or impairment of her physical and emotional health, by repeatedly causing her to ingest a quantity of laxative sufficient to cause severe diarrhea, infection of the blood, dehydration and hospitalization from March 1986 to July 19, 1986.
In support of these allegations, CSS presented evidence that respondent suffers from Munchausen Syndrome by Proxy (MSP), a psychiatric disorder in which a parent causes or fabricates a child’s illness. The syndrome was first described by Dr. Ray Meadow, an English physician, in 1977, and characterized as the "Hinterland of Child Abuse”.[1] MSP is a variant of Munchausen’s Syndrome, a related psychiatric condition causing patients to fabricate illness and subject themselves to unpleasant and potentially harmful procedures. The eponym was taken from 16th Century Baron von Munchausen, who was famous for his remarkable tales as a soldier and sportsman.[2]
Factors commonly found in the case histories of MSP which are reported in the medical literature and also found in the case before this court include:
(1) The child’s prolonged illness which presents confusing symptoms defying diagnosis, and is unresponsive to medical treatment.
(2) The child’s recurring hospitalizations, surgery and other invasive procedures.
(3) The child’s dramatic improvement after removal from mother’s access and care.
(4) The mother’s training as a nurse or in medically related fields.
*522 (5) The mother’s unusual degree of attentiveness to child’s needs in hospital.
(6) The mother’s unusually supportive and cooperative attitude toward doctors and hospital staff.
(7) The mother’s symbiotic relationship to the child.
Prominent American and English pediatricians and psychologists who have reported their experience with cases of MSP since 1977 indicate that the syndrome may be far commoner than previously supposed[3] but that its true incidence is unknown because detection is so inherently difficult.[4]
A study published in the Journal of the American Academy of Child Psychiatry in 1983, analyzing 23 cases of nonaccidental poisoning of children (from 1974-1980), which were attributed to MSP, indicated some of the children’s presenting symptoms and the drugs or foreign materials which they had been caused to ingest. Presenting symptoms included diarrhea, vomiting, seizures, bleeding, anorexia and pain. The ingested substances included laxatives, salt, blood, codeine, oral and fecal matter, barbituates and pebbles. Dr. Waller, the author of the study, noted the following obstacles to appropriate diagnosis and management of MSP cases: (1) failure to appreciate fully the relationships of MSP to nonaccidental poisoning of children; (2) the striking symbiotic tie between mother and child; (3) the highly persuasive denial typical of the parent perpetrator; and (4) skepticism of the legal authorities presented with the paradox of a parent who appears to be seeking the best medical care for the child, and to love and dote on the child, while at the same time causing the child’s illness, suffering and even death.[5]
Of the 23 cases reported in Waller’s study, in 1980, five of the children were known to be deceased.[6]
This court is impressed and concerned with the repeated admonitions of medical experts who have become familiar with MSP, to the legal as well as the medical profession, *523 urging awareness of the "warning symptoms” of MSP, so that its early detection is possible, in order to avoid unnecessary and harmful hospitalization, treatment and potential death to an unknown number of helpless children.
"It is incumbent on medical personnel involved with such children and families to educate the legal authorities about this form of child abuse to insure the proper care for the children.”[7]
"Physicians caring for children should be aware of this entity [MSP] in any perplexing or unexplained illness. Failure to do so may commit a physician to perform many unnecessary and harmful investigations.”[8]
"The roles played by the parents and doctors have been examined in hopes of alerting other physicians to the possibility of Munchausen’s Syndrome by Proxy when a baffling pediatric problem is being considered. The swift recognition of this condition may prevent irreparable harm to a child and limit significant use of medial resources.”[9]
"The act of abuse in these cases is a continuous seemingly unconscious act, motivated by the parents psychopathology. Mental health professionals need to be alerted to the warning signs of Munchausen’s Syndrome by Proxy and be prepared to face the often difficult job of managing the treatment of these complex and often life threatening cases.”[10]
FINDINGS OF FACT
Jessica was nine months old at the commencement of this proceeding to determine whether her mother, Lori, caused her to ingest laxatives for four months, resulting in her diarrhea, surgery, and near death. The trial consumed 14 days. Twenty-one witnesses testified, including 12 doctors, one psychologist, respondent and her husband, Jessica’s father.
After studying the medical evidence and considering all the evidence and the credibility of the witnesses, this court finds the petition is sustained by the required preponderance of the credible evidence.
*524 The factors noted above, which are typically found in reported MSP cases, have been found to exist in the history of Jessica’s illness, and in respondent’s characteristics.
1. PERSISTENT DIARRHEA, NO SATISFACTORY DIAGNOSIS HOSPITALIZATIONS AND SURGERY.
Jessica’s pediatrician referred her to the care of Dr. Leonard Newman, chief of pediatric gastroneterology, at Westchester County Medial Center (WCMC) due to dehydration caused by diarrhea and vomiting. After receiving intravenous (IV) feeding, she improved and returned home, only to be readmitted shortly thereafter with the same symptoms. When exhaustive tests revealed no explanation for her condition, she underwent her first major surgical procedure, which revealed unexpected congenital abnormalities, including a "Mecháis Diverticulum”,[11] an "adhesive band”[12] and "gastroesophogeal reflux”. The surgeon who removed the Mecháis and band, testified that he was hopeful those conditions had caused Jessica’s GI problems and that they would not recur. However, shortly thereafter, both the vomiting and diarrhea returned. Reluctantly, a second major surgical procedure was undertaken to determine whether Jessica’s continuing diarrhea was due to adhesions from the first surgery. Neither obstruction nor adhesions that would have caused obstruction were revealed. In the course of this second surgery Jessica’s gastroesophogeal reflux was repaired, and a gastrointestinal tube and broviac catheter were inserted.
After the second surgery, Jessica’s vomiting stopped but her diarrhea continued. More tests were done. Experts were contacted from other institutions — but consultation produced no answers. Every conceivable possibility, from AIDS to cystic fibrosis, was considered and rejected — except for one. The possibility of Jessica being poisoned never occurred to Dr. Newman or anyone else. In retrospect, Dr. Newman testified: "I just never thought of it”. Everyone was so trusting — so helpful — so satisfied with the efforts of the doctors and staff.
After 55 days of hospitalization, Jessica returned home, with diarrhea, attached to two tubes, which were attached to two pumps to regulate the speed of her tubal feeding. One *525 week later, she was readmitted to WCMC, this time in critical condition, in shock, with a 106 degree fever having developed bacteremia. She responded to antibiotic treatment given in the intensive care (IC) unit of the hospital and rapidly improved. During her stay in the IC unit, the nursing staff provided her care. However, when she was transferred to a private room, and her parents assisted in her care, her diarrhea returned. At this juncture, Dr. Newman’s suspicions were aroused. He ordered a chemical test on Jessica’s stool— which revealed the presence of phenophthalien (a chemical found in Ex-Lax and other laxatives). The test was repeated the next day, on other stool samples and again found positive.
2. DISCOVERY OF PHENOPHTHALIEN, CONFRONTATION, REMOVAL OF CHILD FROM RESPONDENT’S CARE.
When Dr. Newman confronted respondent and her husband with the discovery that Jessica had ingested phenophthalien, he was met with surprisingly calm denials from both, and the mother’s tears. Dr. Newman notified Child Protective Services of suspected child abuse, and Jessica was placed in the care of the Department of Social Services.
The next day an incident occurred at WCMC which is relevant to respondent’s credibility. The incident was reported by two nurses who were on duty that day. The testified that respondent requested they accompany her to the pantry (an unlocked room on the pediatric floor where babies’ formulas and other equipment are kept). She wanted to check the formula because she suspected someone was poisoning Jessica. The nurses testified that respondent urged them to accompany her, saying "just humor me”. When the refrigerator door was opened, respondent spotted something dark in one of the partially opaque plastic formula containers. Upon examination, a large bar of Ex-Lax was found in the formula of another hospitalized child. The nurses described respondent’s reaction as "elated”. She said, "this should prove that Mom didn’t do it”, but "please don’t tell Dr. Newman it was my idea to check the formula”. Respondent denied making these statements.
Laboratory analysis of the stool of the baby whose formula was contaminated revealed no phenophthalien. There were no reports of any babies, other than Jessica, suffering from suspicious diarrhea, or of any findings of phenophthalien in any adult or infant stools. The District Attorney was notified of this incident. Since then, neither respondent nor the au *526 thorities have indicated to this court (or the public) any positive results of an investigation.[13]
3. AFTER REMOVAL FROM RESPONDENT’S CARE — DIARRHEA STOPPED.
Prior to discovery of phenophthalien in the child’s stool respondent had provided day-to-day care for Jessica, even in the hospital. After discovery of the chemical in the child’s stool, when respondent’s contact with Jessica was strictly supervised, Jessica’s condition markedly improved. All feeding tubes were eventually removed, and Jessica started to thrive and gained weight.
4. RESPONDENT EXHIBITED CHARACTERISTICS TYPICAL OF MSP MOTHERS. TRAINING IN MEDICALLY RELATED FIELDS.
In every reported case of MSP, the perpetrator has been found to be the child’s natural mother[14] who was almost invariably trained in the nursing or medically related area and was "medically sophisticated”.[15] Respondent has been employed as a dental assistant and most recently as a medical secretary. Her command of medical terminology and ability to articulate Jessica’s complicated medical history is impressive.
REMARKABLE CARE OF CHILD IN THE HOSPITAL
The MSP mother is characterized by her extraordinary dedication to her child’s care in the hospital, virtually never leaving his bedside, and appearing to thrive in the hospital, making friends of nurses and staff.[16] Of 19 MSP mothers studied in England, over half remained in the hospital with their children.[17]
The testimony of Dr. Newman and the hospital nurses confirmed respondent’s description of the exhausting attention she devoted to Jessica in the hospital. She not only assisted the nursing staff, but apparently took charge of many of the child’s needs and complicated medical care, spending many days and nights at the bedside of the sick child, and even offering assistance and comfort to other mothers in the hospital.
*527 UNUSUALLY SUPPORTIVE AND TRUSTING TO DOCTORS
The MSP mother’s attitude toward doctors is described as unusually supportive and trusting, "virtually lifting the nursing and medical staffs spirits after each unsuccessful attempt to diagnose the child’s illness”.[18] One such "caring and home-minded mother” who caused her infant son to ingest large quantities of salt, eventually causing his death, thanked the doctors for their care, after having been accused of poisoning the child, and then attempted suicide.[19] Another MSP mother was described as "concerned and loving” but "sometimes not quite as worried about the possible cause of the [child’s] illness as were the doctors”.[20] This woman had contaminated her child’s urine with her own urine and menstrual blood, causing the child to exhibit baffling symptoms, which resulted in 12 hospitalizations, seven X-ray procedures, five cystoscopies, toxic drug treatment and numerous other unpleasant investigative procedures. After the mother was confronted with her falsification of the child’s symptoms, she entered out-patient psychiatric treatment and the child’s urinary symptoms disappeared and did not recur.
Doctors described respondent as "surprisingly trusting” when anticipating Jessica’s first exploratory surgery. Her attitude differed markedly from that of other parents who appeared more "worried” and "challenging”, when surgery was resorted to, in seeking a diagnosis of the child’s puzzling illness. Respondent’s response to the anticipated exploratory surgery, "whatever you say”, was unusual. Doctors noted respondent’s "trusting, helpful, supportive” attitude. The only "abnormal feature” of her reaction to Jessica was her "unusual ability to roll with the punches”. She would describe a "horrible” series of medical events, without complaint.
SYMBIOTIC RELATIONSHIP BETWEEN RESPONDENT AND
JESSICA.
The symbiotic nature of the relationship between MSP *528 mother and child, noted in the literature,[21] is characterized by a "failure of differentiation of the two individuals. Hence, if the parent experiences conflicting emotions, the child, felt as part of her, may become the subject of mother’s love and hate resulting in an alternating feeling of blame and attack, with overprotective care. The result is the paradox of the parent administering the drugs, yet being concerned at the child’s subsequent symptoms.”[22]
The MSP mother is described as almost always "doting” on the child. "Special anxiety and overprotectiveness are probably the last thing one would expect to find in conjunction with a form of child abuse * * * The child’s fabricated illness seems to express the parent’s sense of being sick and need for attention and help. Inherent in the syndrome is the ultimate contradiction between love for the child and the need to make the child ill.”[23]
In one extreme case, the child was reduced to such a state of overdependence and withdrawal that he arrived in the hospital in a wheelchair. The mother "insisted on being resident with him in the ward, seeming to foster his total dependence on her, carrying him around on her hip, performing all his toiletry and sleeping at his bedside for five weeks.” After the child’s urine was found to be contaminated with diuretics, he was removed from his mother and eventually treated in a mental hospital.[24]
Significantly, the term "symbiotic”, commonly applied to MSP mothers, was used to describe respondent’s relationship with Jessica by respondent’s expert witness, Dr. Eileen Bloomingdale, a clinical psychologist who interviewed respondent several times. She observed respondent with Jessica in the hospital and with her 2[1]/£-year-old son, Joshua at home. In addition, she administered various psychological tests to respondent. Among her observations, the doctor noted "Respondent’s difficulty in separating” from Jessica, remarking that she had "great identification” with the child. Dr. Bloomingdale referred to respondent’s remarkably close care of the baby and her apparent "need to be needed”. On the thematic aperception test (TAT), three times respondent made two different people into one, "two people who did not even look *529 alike”. Dr. Bloomingdale observed that "she ignores reality”. On the Rorschach test, respondent mingled two figures, unable to separate "me” from "thee”. Dr. Bloomingdale indicated that although this behavior did not signify mental illness, it connoted a "symbiotic” intermingling of personalities between mother and child, and that she would prefer to see more of a "boundary” between them.
CONFLICTING EXPERT TESTIMONY
Dr. Newman’s diagnosis of Jessica’s condition as diarrhea caused by laxative ingestion was based upon his treatment and observations of her condition from March 1986 to July 1986, the discovery of the phenophthalien in her stool, her recovery after removal from her mother’s care, and his recognition of similarities between certain characteristics of respondent and the typical MSP perpetrator. Dr. Newman was the only witness who had had prior experience with MSP cases. He had encountered the syndrome twice at WCMC, and twice at other hospitals and was familiar with the literature on the subject prior to this proceeding.
Dr. Frederick Daum, Chief of Pediatric Gastroentrology at Northshore University Hospital, who testified as an expert for respondent, disagreed with Dr. Newman’s diagnosis. Basing his opinion solely upon his review of Jessica’s hospital records and an examination of Jessica prior to his testimony, he found other explanations for Jessica’s persistent diarrhea. Initially, the Mecháis diverticulum and band could have caused diarrhea. After removal of the Mecháis and band, adhesions developed which could have caused obstruction and resulting diarrhea. After removal of the adhesions, infection or other reactions could have caused diarrhea. Dr. Daum further testified that in his opinion chronic laxative ingestion would have caused Jessica to become even more ill than she was.
Both physicians are highly qualified pediatric gastroentrologists. However, Dr. Newman’s testimony is by far the more persuasive. In his role as treating physician, he had the experience of personally observing the child and frequent contact with her other physicians and hospital staff during the period in question. No motive can be ascribed to his initial diagnosis and immediate report to Child Protective Services other than his concern for the child’s safety. In contrast, Dr. Daum’s testimony was based solely on his review of hospital records and examination of Jessica prior to trial. He had no prior professional experience with MSP.
*530 Respondent was evaluated by two board-certified psychiatrists and a psychologist (Dr. Bloomingdale, referred to above). None had prior experience with MSP, or even more than a casual awareness of the syndrome prior to this case. All agreed that respondent evidenced no psychosis or psychopathology. Only Dr. Viederman, the court’s witness, had reviewed Jessica’s medical history as reported by Dr. Newman prior to forming an opinion.
Dr. Milton Viederman, the court’s independent witness, found "a high probability” that respondent caused Jessica to ingest laxatives, basing his opinion on interviews with respondent and her husband, Jessica’s medical history as reported by Dr. Newman, and the medical literature on the subject of MSP. He noted respondent’s only unusual observable quality was her "extraordinary calm, apparent self-assurance, lack of concern and apparent confidence with the interview process”.
Neither he, nor any other expert, found evidence of psychosis or psychopathology.
The opinion of Dr. Abraham Halpern, respondent’s expert, that respondent did not suffer from MSP was based solely upon interviews. His confidence that his psychiatric training enabled him to determine the respondent’s veracity ignores the frequent admonition in MSP literature regarding the remarkable ability of MSP perpetrators to deceive the medical profession. "The medical sophistication of an MSP perpetrator cannot be underestimated” was noted in a case where the MSP mother manipulated a child’s broviac catheter causing him to appear to be bleeding, and subjected the child to emergency surgery.[25]
Dr. Eileen Bloomingdale, respondent’s witness, found no "one-to-one” tie between respondent and MSP, but reported that psychological testing revealed respondent as a "hysterical” personality, a characteristic common to MSP mothers [26] (a hysterical personality was characterized by "detachment, disassociation, isolation, dependence and passivity [floating with responsibility for what’s happening]).” Psychological testing also revealed respondent’s symbiotic relationship with Jessica. Dr. Halpern (who engaged Dr. Bloomingdale to perform the psychological tests) disagreed with her diagnosis.
The motivation of MSP perpetrators has yet to be fully *531 explained. However, several authors have presented theories regarding the motivation and psychodynamics involved.
"The child’s fabricated illness seems to express the parent’s sense of being sick and in need of attention and help.” Loneliness is noted as a possible motivation. "Illness was the ticket of admission to a place where understanding and caring relieved the feelings of hopelessness and isolation.”[27] "In this symbiotic situation, the child’s fabricated illness seems to express the parent’s sense of being sick and in need of help.”
In one case a doctor commented the mother appeared to be "bleeding through her child’s kidneys”.[28] Ambivalence toward the medical profession and feelings of inadequacy are also noted.
Factors associated with other forms of child abuse are typically absent in MSP cases. There is no psychopathology evident, nor history of abuse by parents, nor economic stress nor the special characteristics of an abused child.[29]
"The parent does not appear to be lying, nor does psychiatric evaluation reveal other evidence of psychosis. Ravenscroft and Hochheiser (1980) have perhaps best characterized the parent’s thinking as 'quasi-delusional’ but there is typically no thought disorder. The disturbance in thought content and behavior may be a disassociative phenomenon or a form of pseudologia fantástica or pathological lying in which the parent comes to believe almost intuitively the fantasy that the child has a primary, rather than factitious illness.”[30]
CONCLUSIONS OF LAW
Laboratory reports indicating the presence of phenophthalien in Jessica’s stool in July 1986 established the fact that she had been caused to ingest laxatives at that time. All other evidence leading to this court’s finding that respondent caused Jessica to ingest laxatives from March to July 1986 is circumstantial. However, the chain of evidence in this case establishes by more than the required preponderance the allegations of the petition. The preponderance standard provided by Family Court Act § 1046 (b) (i) has been held to afford due process. (Matter of Tammie Z., 66 NY2d 1 [1985].)
*532 Where a child is found to sustain injury or suffer from a condition that would not ordinarily exist except for the acts or omissions of the person legally responsible for his care, there is prima facie evidence of abuse. (Family Ct Act § 1046 [a] [ii].) This doctrine of res ipso loquitor has been applied to explain specific injuries of children by strong inferences of abuse (or neglect). (Matter of Charmine W., 61 AD2d 769 [1st Dept 1978]; Matter of Tashyne L., 53 AD2d 629 [2d Dept 1976].) The application of this rule has not been limited to cases where the child is never out of the parent’s control, but applied where the parent has primary custody during the critical period when injury was sustained. (Matter of Tara H., 129 Misc 2d 508 [Fam Ct, Westchester County 1985].)
No other explanation was offered as to Jessica’s diarrhea from March to July other than respondent’s role in causing her to ingest laxatives. Even Dr. Daum’s attempt to explain Jessica’s diarrhea prior to July did not explain the presence of phenophthalien in July, or Jessica’s recovery after removal from respondent’s care. Who (other than respondent, suffering from MSP) was motivated to cause Jessica’s illness? The fact that Jessica’s diarrhea persisted at home and in the hospital, and that no phenophthalien was found in the stool of other children (or persons) at WCMC, discourages suspicion of a nurse/perpetrator. The child’s father has not been accused, and is apparently not suspect. As no other explanation has been offered, res ipso clearly applies.
Research reveals only one New York legal proceeding involving MSP (Fogerty, J., Queens County, Fam Ct [N-943-84], Mar. 1985). There, a petition was brought by the Department of Social Services against both parents, alleging that the respondents had intentionally contaminated the child’s IV lines with corrosive substances causing many extraordinary infections. These actions were found to be caused by respondents who were suspected to suffer from MSP. The court applied the res ipso doctrine, and sustained the petition by a preponderance of the evidence. (See also, People v Phillips, 122 Cal App 3d 69, 175 Cal Rptr 703.)
DISPOSITION
A dispositional hearing was waived by all parties. Therefore, pursuant to Family Court Act § 1047, a combined fact-finding and dispositional order is entered.
Any disposition of this matter poses serious risks to the *533 child. Dr. Ray Meadow, who first recognized MSP, notes that more than half of the child victims of MSP have eventually been removed from parents and placed in foster care.[31] The risks entailed in leaving the child at home include: (1) illness produced by the perpetrator; (2) illness simulated by the perpetrator; and (3) real illness not treated, due to the family’s feeling of being threatened as a result of legal proceedings.
Removal of the child to the unknown circumstances of foster care poses other risks. Such an order would result in the child’s separation not only from respondent/mother, but from her father, her sibling, and her grandparents. This further disruption of Jessica, who, at 13 months of age has been subjected to such great physical and emotional suffering, would cause her further trauma, and possibly permanent damage.
Neither the expert witness, nor Jessica’s Law Guardian advocated her removal from her parents’ home. Dr. Newman recommended that she be returned home with safeguards, testifying that in his experience with other MSP cases, confrontation of the mother resulted in her cessation of the abusive conduct. Dr. Bloomingdale testified that even if respondent had caused Jessica to ingest laxatives, she did not believe she was likely to do it again, once having been confronted.
The most prudent course appears to this court to be one which permits Jessica to remain at home while providing maximum safeguards, such as have been advocated by the professionals who have had experience with MSP cases, subject to review in six months. Recommendations of others include a plan whereby communication between respondent’s psychiatrist and the child’s primary physician is assured.[32] This contact is obviously necessary since the child’s illness is the only reliable symptom of the mother’s disorder. The necessity for psychiatric intervention is not challenged, notwithstanding its failure to be effective in all cases.
NOW, THEREFORE, IT IS HEREBY ORDERED:
1. Jessica is found to be an abused child, pursuant to Family Court Act § 1012 (e) (i), in that respondent has caused her to *534 ingest sufficient quantity of laxatives from March 1986 to July 19, 1986, so as to cause her serious illness, hospitalization and surgery.
2. Jessica is placed in the care and custody of her father, under the strict supervision of the Westchester County Department of Social Services (DSS), to reside in Westchester County and not be removed therefrom for a period of 18 months, the term of this order.
3. DSS shall structure and monitor a plan to coordinate efforts and communication between respondent’s psychiatrist, Jessica’s pediatrician, her father’s therapist, Dr. Newman, and the DSS caseworkers.
4. DSS shall arrange for psychiatric treatment for respondent with a board-certified psychiatrist on no less than a once-a-week schedule.
5. DSS shall arrange for therapy for Jessica’s father, on a schedule convenient to his employment, to assist him in coping with the special needs of the family and Jessica.
6. Jessica’s father may select any board-certified pediatrician for her regular care.
7. DSS shall arrange for Dr. Leonard Newman at WCMC to examine Jessica once a month.
8. Releases shall be provided DSS by respondent (for attendance information) from her psychiatrist, and by Jessica’s father for all information regarding Jessica from her physicians.
9. All doctors and therapists noted above shall be provided with this decision and order by DSS within 30 days of entry of this order.
10. DSS shall provide a nurse to assist in Jessica’s care (one shift daily) until review of this order on July 27, 1987.
11. DSS shall make announced or unannounced bimonthly visits.
12. In the event DSS finds that this order has been violated, or if, in the opinion of any one of the above physicians or therapists, Jessica appears to be at risk, DSS shall remove her from her parents’ home without necessity of first obtaining a court order. In the event of such removal, DSS shall immediately calendar the matter for review before this court.
*535 13. Schedule this order for review on July 27, 1987. Reports from all of the above-noted physicians and therapists shall be submitted to the court and made available by DSS to all counsel (including the Law Guardian). The court shall then determine whether nursing care shall be discontinued and whether any other modification of this order is required.
[Portions of opinion omitted for purposes of publication.]

. Meadow, Munchausen Syndrome by Proxy — The Hinterland of Child Abuse, The Lancet, Aug. 13, 1977 (hereinafter Meadow).

. Palmer and Yoshimura, Munchausen Syndrome by Proxy, J of Am Acad of Child Psychiatry, 23, 4:503-508 (1984) (hereinafter Palmer).

. Rogers, Tripp, Bentovim, Robinson, Berry, Goulding, Non-accidental poisoning: an extended syndrome of child abuse, British Med J (Apr. 1976) (hereinafter Rogers); Waller, Obstacles to the Treatment of Munchausen by Proxy Syndrome, J of Am Acad of Child Psychiatry, 22, 1:80-85 (1983) (hereinafter Waller).

. Chan, Salcedo, Atkins, Ruley, Munchausen Syndrome by Proxy: A Review and Case Study, J of Pediatric Psychology, vol 11, No. 1 (1986) (hereinafter Chan).

. Waller, op. cit.

. Chan, op. cit.

. Orenstein and Wasserman, Munchausen Syndrome by Proxy Simulating Cystic Fibrosis, Pediatrics, vol 78, No. 4 (Oct. 1986).

. Kurlandsky, Lukoff, Zinkham, Brody and Kessler, Munchausen Syndrome by Proxy: Definition of Factitious Bleeding in An Infant by 51 Cr Labeling of Erythrocytes, Pediatrics, vol 63, No. 2, at 228, 231 (1979).

. Guandolo, Munchausen Syndrome by Proxy: An Outpatient Challenge, Pediatrics, vol 75, No. 3 (Mar. 1985), at 530 (hereinafter Guandolo).

. Chan, op. cit, at 80.

. Mecháis diverticulum is a congenital condition, an outpouching of the intestine.

. Adhesive band is a congenital condition, tissue which should have disappeared in útero.

. Since this proceeding, pursuant to this court’s order, the pediatric pantry at WCMC has been secured from public access and is now restricted to authorized personnel.

. Guandolo, op. cit., at 529; Meadow, op. cit.

. Of 19 MSP mothers, one half were nurses; Guandolo, op. cit., at 529.

. Chan, op. cit., at 72.

. Meadow, op. cit.

. Malatack, Wiener, Gartner, Zitelli and Brunetti, Munchausen Syndrome by Proxy: A New Complication of Central Venous Catheterization, Pediatrics, vol 75, No. 3 (Mar. 1985) (hereinafter Malatack).

. Meadow, op. cit.

. Meadow, op. cit., at 343.

. Waller, op. cit.; Chan, op. cit.; Palmer, op. cit.

. Waller, op. cit.

. Waller, op. cit, at 83.

. Rogers, op. cit., at 794.

. Malatack, op. cit.

. Waller, op. cit., at 83; Palmer, op. cit., at 504.

. Guandolo, op. cit.

. Waller, op. cit, at 82.

. Waller, op. cit., at 83.

. Waller, op. cit, at 83.

. Meadow, op. cit.

. Waller, op. cit.; Palmer, op. cit.; Chan, op. cit.