OPINION OF THE COURT
David Freundlich, J.
By petition verified on August 4, 1992 petitioner herein, the Suffolk County Department of Social Services, Child Protective Services, alleges that the subject child Aaron S., also known as Aaron D. (date of birth Apr. 5, 1984), is a neglected child pursuant to Family Court Act § 1012 (f) (i) in that he is a child less than 18 years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent to exercise a minimum degree of care by unreasonably inflicting or allowing to be inflicted harm upon him. Specifically, Aaron was taken into protective custody on August 1, 1992 at Schneider Children’s Hospital after being diagnosed with Munchausen Syndrome by Proxy, a syndrome in which a parent fabricates or induces medical conditions or illnesses in her child thereby requiring extensive treatment and intrusive diagnostic procedures.
The petition alleges that beginning in 1988 Aaron has been on a continuous course of treatment and hospitalizations for central apnea and has been subjected to cardiopulmonary resuscitation, been connected to an apnea monitor each night and been required to sleep in his mother’s bed each night even though Aaron does not suffer from central apnea or central hypoventilation.
As is apparent from the face of the petition, this is a *969 complex and perplexing scenario. Respondent herein, Ms. S., is being accused of fabricating or inducing a very severe illness in her eight-year-old son for the last four years and the basis for the accusation is the diagnosis of a syndrome so counter-intuitive to our concept of being a parent that it seems unbelievable.
To better understand the medical saga of Aaron, the implications of his family structure, his mother’s psychiatric history and troubled past, along with the role the medical community has played in this complex scenario, it is important to first understand Munchausen Syndrome by Proxy (hereafter referred to as MSP) as described by the experts who testified at trial.
MSP is a variant of Munchausen’s Syndrome, a related psychiatric condition wherein patients fabricate illness and subject themselves to intrusive, unpleasant and potentially harmful procedures. The name Munchausen is derived from the exploits of Baron von Munchausen, an 18th century fabricator of tall tales relating to his adventures as a soldier and politician. His stories were embellished and published by his friend Rudolph Raspe in a popular children’s book called "The Amazing Travels and Adventures of Baron von Munchausen.”
MSP is a diagnosis reached after examining the total picture presented, not any one specific factor. The suspicion that a child may be the subject of a factitious illness or illnesses is raised when a child presented to a doctor has one or more medical problems which do not respond to treatment or which follow an unusual course which is persistent and puzzling, has unexplainable physical or laboratory findings which are physically or clinically impossible and where such puzzling and/or bizarre symptoms abate spontaneously when the child is separated from his parent.
The profile testified to suggests that an MSP parent (in 98% of the cases it is a mother) is articulate and bright, and possesses a high degree of medical knowledge and/or fascination with medical details and hospital gossip, and seems to enjoy the hospital environment. Normally the mother seems almost unperturbed by the serious nature of her child’s medical course and is highly supportive and/or encouraging of the physician and medical staff. She is a highly attendant parent who is reluctant to leave her child’s side and is often perceived as very needy herself. The parent-child relationship is *970 so intimate as to be described as "symbiotic”, i.e., without clear definition between mother and child and their respective needs.
The suspected parent may be a health care professional, have a nursing degree or nursing training (statistics quoted suggest that 30-50% of MSP mothers studied were nurses) and, most importantly, the signs and symptoms of the child’s illness fail to occur in the parent’s absence. There may be a family history of sibling illnesses which are also unexplained and, at times, the unexplained or perplexing death of a sibling.
It was also suggested that an MSP parent may have a need for adulation or make herself available to the public by seeking publicity regarding the child’s illness or the suspicion of Munchausen Syndrome by Proxy itself. A family which reports dramatic or unusual happenings during the period that the child’s illness is under suspicion, such as house fires, burglaries, anonymous phone calls and break-ins often fit the profile as well.
Although there appear to be many presentations for MSP the most common include things like seizures, apnea, failure to thrive, vomiting, diarrhea, irritable bowel syndrome and, in older children, things like osteomyelitis and blood borne infections. This also appears to be a fairly dangerous disorder; the original studies conducted in 1977 by Dr. Roy Meadow* suggested a morbidity rate of 10% for the subject children and 5% for siblings and the more recent studies conducted by Dr. Schreier, who testified for the petitioner, seem to correlate with those statistics.
Also included in the profile an of MSP parent is a troubled past; although she presents a credible and sympathetic figure she is often isolated, alienated from family, without a support network, and often presents herself as a victim of abuse. The experts suggest that MSP does not have a known psychopathology but that the parent’s psychiatric history, if any, becomes relevant when examining the entire constellation of factors. One trait was consistent with all MSP parents and that is that they habitually fabricate and they are quite good at it. They tend to be highly manipulative and use their persuasive abilities to ally themselves with medical staff; often *971 to the point where the medical personnel will come to their defense when the accusation of MSP is made. The inconsistencies in their stories also increase when confronted.
In 1987 the Family Court in Westchester County was faced with the abuse of a nine-month-old infant suffering from MSP. In Jessica Z. (135 Misc 2d 520), Judge Sondra Miller found that the respondent caused her infant daughter to ingest laxatives for four months, resulting in diarrhea, surgery and her near death. As with the instant case, the proceeding was lengthy, with expert testimony including experts with conflicting views, and turned on the credibility of key witnesses. Also as with the instant case, there was no surreptitious videotaping of the mother inducing symptoms but rather an immediate and almost miraculous recovery when contact with the mother was curtailed and strictly monitored. The court notes parenthetically that without the videotaping suggested and/or actually accomplished in other jurisdictions (Matter of Tashyne L., 53 AD2d 629 [2d Dept 1976]; Family Ct Act § 1046 [a] [ii]), the cases require a res ipso loquitur type of analysis, where the circumstantial evidence is cumulative and the dramatic abatement of illness upon removal from the parent speaks for itself.
SUMMARY OF TESTIMONY
The impetus for the diagnosis that Aaron was suffering from MSP was made during his most recent hospitalization for dental surgery. Because of his long and unexplained history of central apnea since 1988 and the need for general anesthesia for the dental surgery, Aaron was admitted to Schneider Children’s Hospital (hereafter Schneider’s) on July 20, 1992 with the expectation that he would be observed in the pediatric intensive care unit for two nights postoperative to monitor any apnea problems.
Schneider’s is a well-respected tertiary care hospital with national and international recognition. It cares for many profoundly ill children and is a teaching hospital. As such, patients there are routinely subjected to multiple interviews and examination relative to the teaching function of the hospital. During one such interview the respondent, Ms. S., was questioned as to why Aaron was in the pediatric ICU and she related that his pediatrician, Dr. V. Palusci, and his pediatric neurologist, Dr. G. Novak, thought it best that he be monitored after his dental surgery based on his long history of central apnea, which has continued since surgery for appendi *972 citis in 1988. When questioned further she related that Aaron still had multiple episodes of apnea per night; that during the last four years he has had four or five respiratory arrests requiring cardiopulmonary resuscitation, chest compression, oxygen and emergency room admittance; that he rarely had two nights in a row without an apnea episode; that when he had an episode he had low heart rate (bradycardia), his lips turned blue and that she sleeps with Aaron every night so that she can quickly stimulate him by touching him (so that he will begin breathing again). The doctor upon hearing the history became alarmed at the seriousness of the scenario presented him and requested another meeting with Ms. S.
The doctor who became concerned is Dr. Sagy, the Chief of the Critical Care Medicine at Schneider’s at the Long Island Jewish Medical Center. He was formerly an Associate Professor of Clinical Pediatrics at Columbia University College of Physicians and Surgeons; is currently an Associate Professor of Pediatrics at the Albert Einstein College of Medicine; is board certified in pediatrics (Israel and United States of America) and pediatric critical care medicine; and he is an expert in the field of pediatric apnea.
Dr. Sagy testified that apnea is a cessation of breathing, that we all stop breathing for brief periods when we sleep but we spontaneously begin again. With central apnea the patient has some neurologie problem or immaturity, as with infant apnea of premature babies. When undiagnosed and unmonitored these premature babies are at high risk for Sudden Infant Death Syndrome. Other than central apnea, which is a central nervous system disorder, there are only two other types of apnea; obstructive apnea, where the patient struggles to breathe but is impeded by an obstruction of some type and Ondine’s Curse or central hypoventilation, which is a rare genetic disorder where the episodes of apnea are life long and the patient normally requires mechanical ventilation at night and must have a tracheotomy to accommodate the night ventilation (without such mechanical aid the patient dies).
Dr. Sagy also testified that it is possible for a young child to experience apnea for one or two hours after surgery when the patient has not fully recovered from the anesthesia. He went on to state that central apnea does not "go away.” The exception being premature infants whose neurological system matures with age or an acute trauma to the central nervous system which will heal over time, central apnea is a lifelong, life-threatening condition which cannot appear and then disappear.
*973 Also on the critical care team which considered the symptomology presented by Ms. S. was Dr. Lanzkowsky, who is Chief of Staff at Schneider’s. Dr. Lanzkowsky was a Professor of Pediatrics at the School of Medicine at the State University of New York (SUNY) at Stoney Brook from 1970 to 1989; he is presently Chairman of Pediatrics at Long Island Jewish Hillside Medical Center; Professor of Pediatrics at Albert Einstein College of Medicine; Chief of Pediatric Hematology-Oncology, Long Island Jewish Hillside Medical Center; lecturer at SUNY Downstate Medical Center; editor-in-chief of "Children’s Hospital Quarterly”; he has authored or coauthored 253 various publications, among which are articles directly relating to MSP.
Both Dr. Sagy and Dr. Lanzkowsky testified that the meeting with Ms. S. was to present their concern for Aaron given the history presented and constant vigilance required by her. They discussed the option of a tracheotomy and night ventilation with her and stated that before such a drastic measure would be taken it was important that a member of the hospital staff witness an episode of apnea. They also suggested that a more exacting study could be accomplished while he was in the ICU by performing an "arterial line” which would measure Aaron’s blood gases right in the artery during any apnea episodes without having to draw blood (thereby waking him and defeating the purpose of measuring sleep apnea). Ms. S. refused to consent to the arterial line. When she was confronted by the staff’s request to keep Aaron in the ICU until the staff witnessed the apnea Ms. S. became agitated. She threatened to remove him, to call her lawyer, to call patient rights, and was very upset. She could not understand why Schneider’s wanted to actually see an episode of apnea when other nurses had seen it before and was adamant that no arterial line or tracheotomy be performed.
To put this rejection in perspective, it must be noted that just three days prior to this Ms. S. had related to the ICU nurse, Mary, that her nights were very difficult, and she kept constant vigil due to Aaron’s persistent apnea. She also told Mary that she was a nurse, although not currently working. In fact, during Aaron’s second morning in the ICU and while Mary was busy with another patient, Aaron’s apnea monitor "sounded.” Mary was assured by Ms. S., who was at Aaron’s bedside, that although he was not breathing she had stimulated him and he was now fine. However, Mary also testified *974 that not long before the alarm sounded, when she came on duty, Aaron was awake.
Mary further testified that Ms. S. told her that because Aaron’s apnea appeared in 1988 the second night after his appendectomy that the second night after his dental surgery would be the most critical. Given Ms. S.’s statement that the second night was the critical period it is curious that she was so upset at the prospect of keeping Aaron in the ICU until the staff observed an apnea episode and she persisted in her efforts to remove him from the hospital.
The fact that the alarm "sounded” on the morning of July 21st was reported by the nurse and brought to Dr. Sagy’s attention but it was also reported that she did not actually see Aaron because she was busy with another patient. At the initial meeting with Dr. Sagy, Ms. S. was again told that she was not to intervene should Aaron’s alarm sound; she was to call a nurse and they would provide his care.
Since the history presented to Dr. Sagy did not make medical sense and the arterial line was rejected by Ms. S., it was decided that Aaron was to have a nurse assigned to him at all times. The nurse was instructed not to remove her eyes from Aaron so that an objective observer could document what Aaron’s condition was. No alarms sounded from the apnea monitor after Aaron was assigned a private nurse.
After Aaron did not have any episodes of apnea for three days, he showed no symptoms of having apnea and after consultation with the critical care team, the decision was made that he did not have apnea. However, to be absolutely certain he would be kept under constant observation. On July 24th another meeting was held with Ms. S. where the critical care team presented her with their opinion that Aaron did not have apnea. Her retort to this news was that Aaron did not have apnea every night, that sometimes he would go three or four nights without any episodes. Perhaps, she offered, since the appendectomy surgery "gave” him the apnea, the dental surgery somehow "cured” him.
The doctors found her theory absurd but were even more troubled by her continual change in story. At her initial meeting she reported never having had a night without having to stimulate Aaron from his bouts of apnea. When confronted with 3 and 4 nights without any apnea episodes she suddenly remembered that Aaron often went that long with no apnea. Later she related that weeks could elapse between episodes.
*975 When confronted with the possibility that Aaron’s apnea might be factitious, Dr. Sagy stated that she asked him: "You mean Munchausen Syndrome by Proxy?” A statement she denied at trial.
On July 30th the ICU night nurse on duty related that while in the cubicle next to Aaron caring for another child, she saw Ms. S. shake Aaron to the point where she lifted his head and shoulders off the bed and startled him awake. This was very early in the morning sometime between 12:00 midnight and 2:00 a.m. The nurse, Cynthia, testified that she could see Ms. S. shaking Aaron and that Aaron’s color was good, his chest was rising and falling and he was breathing fine. Because she could not interrupt the care she was giving her patient, she pushed a cart into the wall to make a loud enough noise to let Ms. S. know she was watching and that she could see that Aaron was alright. She observed that she startled Ms. S. and that Ms. S. immediately stopped shaking Aaron.
Ms. S. testified that that incident never took place. Not only did nurse Cynthia lie when she testified that she saw Ms. S. shaking Aaron, but nurse Mary lied when she testified that Ms. S. told her she was a nurse and that she never slept through the night because Aaron’s monitor went off 2 to 3 times per night and she needed to shake him.
Ms. S. also testified that she never suggested that the dental surgery might have "cured” Aaron’s apnea, that she never told Dr. Sagy at their first meeting that Aaron had apneic episodes every night and never suggested the term MSP to Dr. Sagy. Both Dr. Sagy and Dr. Lanzkowsky testified that she was told that a tracheotomy would be considered only after an episode of apnea was observed by the Schneider’s staff. She testified that this extraordinary measure was presented to her as a necessary step. She related that she considered the recommended course of treatment to be the act of an "aggressive maniac.”
Aaron’s foster mother testified in January 1993 that Aaron has been with her since August 24, 1992 and that he has never had an episode of apnea, is not connected nightly to a monitor and sleeps in his own bed, albeit with a night light, and has missed only one day of school.
The fact that Aaron has had no apnea is the most compelling component in the constellation described as MSP. Dr. Novak, a neurologist at Schneider’s, has been attempting to *976 make sense of Aaron’s apnea since 1988. In an effort to find the etiology of his aberrant spells of apnea, bradycardia and respiratory arrest he had ordered numerous tests. One sleep study, conducted in December 1988 showed a curious deviation in Aaron’s breathing. Although it was labeled an abnormality at the time Dr. Novak explained that a lone deviation or abnormality is not significant and the study was, overall, inconclusive. In all likelihood it was an artifact.
He also testified that he has been puzzled by his own observations because the history provided by Ms. S. was not consistent with Aaron’s symptoms; he had even considered MSP before but discounted it because Ms. S. presented herself as a nurse and she was highly credible. He had nothing to disprove that the episodes reported by Ms. S. were not factual. Aaron’s case was unique and presented a one-of-a-kind dis-function in which his mother reported multiple episodes of apnea and bradycardia, although every test performed failed to document central apnea. Dr. Novak testified that he never suggested that Aaron be removed from the monitor despite the basically inconclusive testing because he still relied on the reporting by Ms. S. (Drs. Lanzkowsky and Cunningham, both involved in teaching other doctors, stated that the first thing a pediatrician is taught is to listen to the parent, it is therefore counter-intuitive to suspect that the parent is not telling the truth.) In retrospect, Dr. Novak testified he was mistaken when he labeled the probable artifact in the sleep study an abnormality and is now convinced that Aaron’s medical saga is an example of MSP. The strongest support for that opinion is that Aaron has had no apnea since he was removed from his mother’s care.
In all of the various hospital admissions and records of treating physicians before the court Aaron is presented as a child with apnea since 1988, but also as a child who had infant apnea. In 1984 when he was about six weeks of age, his mother reported a near death SIDS episode. He was placed on a monitor until 10 months of age when he was discharged after being free of apnea for two months.
(Further testimonial synopsis is omitted for the purpose of publication.)
CONCLUSIONS
The factors most common to MSP and which the court finds in the instant case include:
*977 (1) A past medical history such as the one presented by Aaron which shows a pattern of multiple care providers and the presentation of unusual, confusing, and rare (or even bizarre) symptoms which abate spontaneously when removed from his mother.
(2) A parent-child relationship which is excessively intimate or symbiotic and where there is a blurring of generational lines. Aaron and his mother slept in the same bed for the last four years, she has demonstrated a real problem separating from Aaron and Aaron sees himself as her protector.
(3) A parent history and life circumstance which shows a high degree of medical knowledge and a social isolation devoid of significant relationships. There is no doubt that Ms. S. is medically sophisticated, that she uses this to her advantage (and her children’s disadvantage, i.e., hospitalization and testing based on her characterization as a nurse). There is also ample evidence that she has no support network and she has had a troubled psychiatric and social past.
The deciding issue for the court is one of credibility. The court is hard pressed to find that Drs. Sagy, Lanzkowsky, Cunningham and Novak would fabricate the actions of Ms. S. or would all come to an incorrect diagnosis that Aaron does not have apnea but is the victim of MSP and is in all other respects a physically healthy boy. The court would also be hard pressed to find that Aaron’s ICU nurses at Schneider’s did not accurately report their observations of Ms. S.’s behavior. To the contrary, the court finds each of those witnesses’ testimony to be credible.
However, the court does not find much of Ms. S.’s testimony to be credible; it was continually controverted by other witnesses and records. She testified that she never threatened or attempted suicide and never threatened to harm her two oldest children; the records from Kings Park Psychiatric Hospital state that she admitted suicidal ideation prior to her admittance for attempted suicide and the records from South Oaks Psychiatric Center state that she admitted threatening to kill herself and her two children. While Ms. S. denies her sister’s testimony that she threatened to kill her sister and that she threatened to harm her unborn child by placing a knife up her vagina, the court does not find her denial credible.
The court finds the testimony of a police detective that he found no visible signs of a forced entry relative to an alleged *978 break-in to be credible. Ms. S.’s allegations that the detective missed the signs of the alleged break-in are not credible.
Likewise, the court finds her convenient lapse of memory when asked if she represented herself as a nurse and represented herself as married to the two men who fathered her four children to be incredible. The court does not believe her denial of the fact that it was she who introduced the term "Munchausen Syndrome by Proxy” into the conversation with Dr. Sagy.
The most pertinent of Ms. S.’s denials of the truth revolve around Aaron’s most recent hospitalization. The court finds the ICU nurse’s testimony that Aaron was awake prior to the two apnea alarms wherein Ms. S. represented that he was not breathing and she had to stimulate him to be believable and the other nurse’s testimony that Ms. S. was observed shaking Aaron from a sound sleep to a startle to also be believable. The court finds Ms. S.’s denial of these incidents to be beyond belief.
The entire scenario of stating that Aaron suffered multiple apnea episodes nearly every night of his life, then changing the scenario to days without apnea and then weeks without apnea is another example of Ms. S.’s fabrication. A further example is her denial that she suggested to Dr. Sagy that the appendectomy anesthesia gave Aaron apnea and that the dental surgery anesthesia cured him of apnea.
Based on the testimony of Drs. Sagy, Lanzkowsky, Novak, and Cunningham, that Aaron does not have apnea and his freedom from any signs of apnea during the past six months, the court is convinced that Aaron does not have apnea at all, but is the victim of MSP. Therefore, the court determines that Ms. S.’s testimony that she reacted to apnea and not merely apnea alarms during not only his last hospitalization but during the past four years to not be credible. The court is unpersuaded by Dr. Kelly’s unpublished study and her explanation which sets forth an aberrant variable form of apnea which comes and goes; especially since she has never examined Aaron; the court is likewise unpersuaded by Dr. Palusci’s concurrence.
Accordingly, based on a preponderance of the credible evidence and the Law Guardian’s recommendation the court finds that the respondent, Ms. S., has neglected her son Aaron by subjecting him to a continuous course of medical treatment for apnea which he does not have as a result of his being a *979 victim of Munchausen Syndrome by Proxy and it is hereby adjudged that Aaron S., also known as Aaron D., is a neglected child pursuant to Family Court Act § 1012 (f) (i) and the matter shall proceed to dispositional hearing on February 22, 1993. Pending the dispositional determination Aaron shall remain in the custody of the Department of Social Services.
Pursuant to Family Court Act § 1046 (a) (i) proof of the abuse or neglect of one child is admissible evidence on the issue of the abuse or neglect of another child of respondent. (Matter of Jovann B., 153 AD2d 858 [2d Dept 1989; Matter of James P., 137 AD2d 461 [1st Dept 1988].) A finding of derivative abuse or neglect of one child based on the finding of abuse or neglect of a sibling may be proper where the offensive conduct proven as to one child was not remote in time (Matter of James P., 137 AD2d 461, supra; Matter of Cruz, 121 AD2d 901 [1st Dept 1986]; Matter of Maureen G., 103 Misc 2d 109 [Fam Ct, Richmond County 1980]); where the conduct was serious or involved a course of abusive or neglectful behavior (Matter of Jovann B., supra; Matter of Susan B., 102 AD2d 938 [3d Dept 1984]); and where the conduct demonstrates a fundamental defect in respondent’s understanding of the duties and obligations of parenthood (Matter of Christina Maria C., 89 AD2d 855 [2d Dept 1982]; Matter of Rasheda S, 183 AD2d 770 [2d Dept 1992]).
In deciding whether respondent’s conduct demonstrates a fundamental defect in respondent’s understanding of the duties and obligations of parenthood for the purpose of making a finding of derivative abuse or neglect of a sibling, the court need not exclude common sense and everyday experience from its deliberations. (Matter of T. C., 128 Misc 2d 156 [Fam Ct, NY County 1985]; Matter of Cindy B., 122 Misc 2d 395; Matter of Christina Maria G, supra.)
While proof of abuse or neglect as to one child, without more, constitutes neither prima facie or presumptive evidence of abuse or neglect of that child’s sibling, the court in Matter of T. C. (supra) noted that the purpose of Family Court Act § 1046 (a) (i) was to avoid any potential objection as to relevancy. The court reasoned that "[i]f the Legislature had intended that proof of prior abuse or neglect of another child not related to ongoing conditions constituted prima facie evidence of abuse or neglect, it would have so provided. This provision does not so provide, a fact highlighted by its juxtaposition to those provisions [of section 1046] that accord prima facie evidence treatment to other conduct.” (128 Misc 2d, at 159-160, supra.) However, the proviso of Family Court Act *980 § 1046 is not an absolute and must be interpreted within the context of the conduct presented. Behavior which presents a presumption of continuance as to the subject child is highly indicative of behavior which "logically” supports the conclusion that the parent has a faulty understanding of the duties of parenthood and that the sibling children are, therefore, also the subject of neglect. (Matter of Christina Maria C, 89 AD2d 855, supra; Matter of James P., supra; Matter of Cruz, supra.)
There is little doubt here that Aaron’s neglect was a continuous course of conduct. The finding that he is the victim of MSP has, as its basis, a cumulation of behaviors encompassing the last four years; no one particular procedure, treatment, or hospitalization can be the basis of that determination. Rather the entire course of conduct must be examined. Once a condition, status, state of facts or state of mind is found to exist it is presumed to continue. (Matter of Iris C, 46 AD2d 910; Richardson, Evidence § 74 [Prince 10th ed]; Fisch, NY Evidence § 1122 [2d ed].) The court concludes, therefore, that the MSP conduct will not spontaneously abate with the finding of neglect.
There is also little doubt that Ms. S.’s behaviors included in the MSP profile demonstrate fundamental defects in her understanding of the duties and obligations of parenthood. The experts who testified raised very serious concerns for the safety of the other children suggesting that, as physicians, they had a duty and obligation to investigate the other children and would be remiss if they failed to move to protect them. The premise for their concern was not limited to the questionable treatment of Joshua’s seizure disorder but also reflected their concern that Aaron was the target child of the MSP behavior and, with his removal from the home, the objectionable conduct would be directed to the other child(ren). (See also, Matter of Kenya G., 74 Misc 2d 606 [Fam Ct, NY County 1973], citing Helfner & Kempe, The Battered Child [U of Chi 1968].)
Where, as in the instant case, the conduct which formed the basis for finding abuse or neglect is proximate in time to the derivative proceeding it can reasonably be concluded that the underlying problem still exists. When such proximate circumstances are shown, in order to meaningfully protect the rights of siblings to remain free from harm a court cannot and should not "await broken bone or shattered psyche before extending its protective cloak around [a] child.” (Matter of Anthony, 81 Misc 2d 342, 345.)
*981 The risk of harm to the remaining S./D. children is too great to leave their safety in question.
Family Court Act article 10 proceedings were designed by the Legislature to be civil in nature and are clearly distinguishable, in purpose and intent, from criminal actions. Article 10 was not designed to punish respondents for acts committed against their children but to protect their children from further harm. Based on the finding that Aaron is the victim of MSP, that those behaviors are proximate to the petitions filed on behalf of his siblings, Joshua, Dana, and Courtney, that the behaviors involved a continued course of neglectful behavior and that the behaviors are indicative of a fundamental defect in respondent’s understanding of the duties and obligations of parenthood, the court also finds that Joshua, Dana, and Courtney are neglected children.
Accordingly, it is hereby adjudged that Joshua, Dana and Courtney S., also known as Joshua, Dana and Courtney D., are neglected children as defined in Family Court Act § 1012 (f> (i).

 Meadow, Munchausen Syndrome by Proxy — The Hinterland of Child Abuse, The Lancet, Aug. 13, 1977.