547 So.2d 981 (1989)
Leon PALMER, Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 88-1368.
District Court of Appeal of Florida, Fifth District.
August 3, 1989.
Harry S. Coverston, of Coverston & Poole, P.A., Orlando, for appellant.
Robert A. Butterworth, Atty. Gen., and Eric J. Taylor, Asst. Atty. Gen., Tallahassee, for appellee.
*982 SHARP, Judge.
Palmer appeals from a final judgment which terminated his parental rights to his son, D.L.P. He argues that the state failed to show by clear and convincing evidence that he had not substantially performed his obligations under a performance agreement he entered into with HRS and that the child had been abused by him. We affirm. However, we acknowledge that the sole basis for the termination of parental rights in this case rests on a finding of prospective abuse rather than any actual abuse of D.L.P. by Palmer.
The record establishes that D.L.P. was born on July 6, 1982. He lived with his mother, father (Palmer), and stepbrother (B.G.), until 1984. In July of 1984 Palmer sexually abused B.G., who was approximately four years old at the time. Palmer pled guilty to committing a lewd and lascivious act upon a child in violation of section 800.04, Florida Statutes (1985). The trial court sentenced Palmer to prison for nine years and recommended he be placed in a sex offender program.
On August 2, 1985, the two children were removed from their mother's care. B.G. had been declared to be a dependent child because of the sexual battery and on November 12, 1985, D.L.P. was declared dependent. D.L.P.'s mother consented to the order, having found herself unable to care for him. Eventually, she consented to having D.L.P. placed for adoption.
HRS tried a variety of temporary placements with D.L.P.'s relatives (material grandparents and paternal aunt and uncle) and foster homes. None worked out well. Dr. Van Twyer, a psychologist who evaluated D.L.P. just prior to the termination hearing, testified that the then five year old child demonstrated "grossly inappropriate" behavior for his age. He was hyperactive, aggressive, and had demonstrated a sexual and homosexual preoccupation consistent with a child who had experienced sexual abuse. He stated that D.L.P. would need therapy and a stable environment to overcome his serious difficulties. Reports from foster parents supported the psychologist's observations.
Pursuant to section 39.451, HRS entered into a performance agreement with Palmer. Because he was then in prison, Palmer's obligations were limited. He was able to fulfill all but one: the successful completion of a sex offender program.
On October 15, 1986, Palmer entered a sex offender program at the South Florida State Hospital. However, he did not complete it; he was released from the program within approximately two months because he was unable to benefit from it. The director of the program explained Palmer showed little remorse for the sexual battery offense; he had a low capacity for insight to his problems and behavior; he did not accept responsibility for his behavior; and his motivation for being treated was "questionable." Palmer told the judge that he had tried his best in the program, and he did not understand why he had failed.
Prior to the termination hearing, Palmer was also evaluated by a psychiatrist, Dr. Lazoritz. Dr. Lazoritz testified that he diagnosed Palmer as an untreated pedophile. A pedophile is a person who has a preference for repetitive sexual activity with prepubertal children. Palmer had related to Dr. Lazoritz his sexual abuse of his stepson  B.G.  as well as other sexual encounters with children in Maine, before moving to Florida. Lazoritz described Palmer as being emotionally immature and narcissistic.
Dr. Lazoritz concluded that Palmer had failed to address the problem of his pedophilia through a treatment program. Such a condition is sometimes "treatable," he said, but it would take at least two to three years of inpatient therapy before Palmer would be able to properly "father" D.L.P. without D.L.P. being at risk. He testified that an untreated pedophile, such as Palmer, when put under stress, or when indulging in alcohol, would likely repeat his aberrant sexual behavior.
Lazoritz concluded that D.L.P. would be "at risk" if placed in Palmer's custody because as an untreated pedophile, Palmer has "a significant potential for abusing a youngster." Even if Palmer underwent a three-year treatment program, the child *983 would always be at "some risk." There was no showing made on Palmer's part that after his release from prison (within approximately one year), he planned to seek therapy for his condition.
The trial judge expressed sympathy and concern for Palmer's desire to retain his parental rights to D.L.P., but he said the child's best interests and welfare required that he adjudicate termination. He based his order on the following finding:
[T]here is clear and convincing evidence that the child has been abandoned by the mother and that the father has sexually abused a step-sibling of the child, and the child is at serious risk of enduring prospective sexual abuse by the father.
Palmer argues that prospective abuse is an insufficient legal basis to terminate parental rights, and that the evidence showed he had substantially complied with HRS' performance agreement. One witness said he had so complied, however, another witness said he had not. Palmer's only apparent failure was not successfully completing the sex offender treatment program. We do not think that whether Palmer substantially complied with the performance agreement is the key issue here.[1] Nevertheless, in this case, his failure is an extremely significant one, since it relates to the likelihood of future child abuse if he were to regain custody of D.L.P.
Until recently,[2] our court has not directly passed on whether "prospective" abuse of a child, however clearly established, is a sufficient legal basis to terminate parental rights. In the prior cases considered by us, there has been an allegation of actual abuse or neglect, and proof of same, with circumstances indicating that the abuse or neglect will continue if the child is returned to the parent. See Spankie v. Department of Health and Rehabilitative Services, 505 So.2d 1357 (Fla. 5th DCA), rev. denied, 513 So.2d 1063 (Fla. 1987); Fredrick v. Department of Health and Rehabilitative Services, 523 So.2d 1164 (Fla. 5th DCA), rev. denied, 531 So.2d 1353 (Fla. 1988); Manuel v. Department of Health and Rehabilitative Services, 537 So.2d 1022 (Fla. 5th DCA 1988).
Our sister courts in the Second and Fourth Districts have taken the lead in this area. In In the Interest of W.D.N., 443 So.2d 493 (Fla.2d DCA 1984), the court held that abuse of other siblings by a parent could be considered as evidence of abuse in a permanent commitment case involving three children, one of whom had suffered no abuse. The court relied upon the definition of "abuse" in section 39.01(2), Fla. Stat. (1981), which contains a future tense element:
`Abuse' means any willful act that results in any physical, mental, or sexual injury that causes or is likely to cause the child's physical, mental or emotional health to be impaired.
It concluded that the parent's propensities to abuse other children, which were shown to be "beyond reasonable hope of modification," constituted too great a risk to the remaining children, to permit custody and a continued parental relationship.[3]
In In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982), the court terminated a mother's parental rights because she was retarded, had a history of past child abuse and was shown to be mentally incapable of caring for her child. The psychologist who evaluated the parent testified that a child in this mother's care would be "at considerable risk of abuse because of her inability to think in terms of the child's welfare." Although there had been *984 no evidence of past neglect, the court said abuse under section 39.01(2) could be established prospectively.
Our sister courts in the First and Third Districts have indicated they may recognize prospective neglect or abuse as a basis to terminate parental rights if such prospective neglect or abuse is sufficiently well-established. In In the Interest of T.D., 537 So.2d 173 (Fla.1st DCA 1989) the court held that the mother's failure to stimulate her child intellectually because of her mental illness was not a sufficient basis to conclude she would neglect or abuse it. Similarly in I.T. v. Department of Health and Rehabilitative Services, 532 So.2d 1085 (Fla.3d DCA 1988), both parents had psychological problems, but they were not so serious to permit the conclusion that the child would be at risk of being abused or neglected in their care.[4]
The issue in prospective neglect or abuse cases is whether future behavior, which will adversely affect the child, can be clearly and certainly predicted. If the parent is so afflicted that no reasonable basis exists for improvement then courts may find prospective neglect or abuse. See In the Interest of J.L.P.; In the Interest of W.D.N. Psychological disorders involving persons of average intelligence pose problems of accurate prognostication of future behavior. See, e.g., I.T., 532 So.2d at 1090, n. 3.
However, the kind of psychological disorder involved in this case  pedophilia  has been studied extensively in recent years. Two conclusions which the studies show and experts agree upon is that there is no easy "cure" for this disorder,[5] and the rate of recidivism from the medical standpoint is extremely high.[6] A person suffering from this condition, particularly one like Palmer who has not been treated and has no prospects for successful treatment, should not have custody of a child who likewise has demonstrated behavior conducive to a sexual abuse situation. This would be tantamount to placing matches in a tinderbox. As the psychiatrist testified in this case, the risks are too high that the child would in fact be sexually abused.
We conclude that the termination of parental rights in this case should be affirmed based on the trial court's finding of prospective sexual abuse. There is no reasonable prospect that Palmer can or ever will be "cured" of, or successfully treated for, his behavioral disorder. Nor does it appear he will be cured within a reasonable time. See In the Interest of C. v. State, 216 Neb. 70, 341 N.W.2d 605 (1983). The record in this case reflects D.L.P. is a difficult, troubled child, badly in need of therapy, and a safe, stable environment to be able to achieve normal adulthood. To require him to actually suffer sexual abuse before permitting the state to intervene would be absurd and especially cruel to this or any vulnerable child.
AFFIRMED.
GOSHORN, J., concurs.
DAUKSCH, J., dissents with opinion.
DAUKSCH, Judge, dissenting.
I respectfully dissent.
Although I can agree there are cases, and will in the future be cases, where prospective abuse is a proper ground for parental termination, I cannot agree this is such a case.
Appellant was imprisoned for child abuse and has served his time. During his imprisonment he was offered a sex-offender treatment program of which he did not take full advantage. It is not clear from the record whether it was his fault or that of the prison or the program that he received little or no benefit. Given a prison environment, however, it is not at all surprising *985 that a treatment effort, any treatment effort, would be unsuccessful. Florida prisons are overcrowded, understaffed, underdeveloped and hardly more than inmate warehouses. Since the designation of mentally disordered sex offenders was made, over twenty years ago to my recollection, there has been little attempt to realistically deal with the problem or adequately treat the treatable in prisons.
Dr. Lazoritz testified that appellant is an "untreated pedophile" as the majority opinion says. He also testified that appellant is treatable, that the facility at which he was given some treatment is not the best program and that the period of time in which he was treated was much too short for any benefit to him. There is no evidence to contradict this testimony.
Given the fact that this appellant has expressed great contrition for his previous conduct upon a child to whom he had no blood relationship, that he is treatable for his mental disorder, that he himself was a foster child and has a fear for his son having to suffer what he says he suffered as a result of being kept from his parents (even being prevented from attending a parental funeral), I am of the opinion that there is some hope for this father and son. I do not believe the state carried its heavy burden of proof, clear and convincing evidence, to establish the probability or even strong possibility that the child would be at risk living with his father. If the father is given medical help and responds, as the psychiatrist said he likely would, then a reevaluation could be made to see if the splitting of parent and child could be prevented. To sever them from each other is premature, in my opinion. I would reverse and remand for an order accordingly.
NOTES
[1] See Spankie v. Department of Health and Rehabilitative Services, 505 So.2d 1357 (Fla.5th DCA), rev. denied, 513 So.2d 1063 (Fla. 1987); In re Interest of R.W., 495 So.2d 133 (Fla. 1986); Fredrick v. Department of Health and Rehabilitative Services, 523 So.2d 1164 (Fla.5th DCA), rev. denied, 531 So.2d 1353 (Fla. 1988).
[2] Padgett v. Department of Health and Rehabilitative Services, 543 So.2d 1317 (Fla.5th DCA 1989).
[3] See also In re Interest of J.J.C., 498 So.2d 604 (Fla. 2d DCA 1986) (the court recognized the concept of prospective neglect as a basis to terminate parental rights where the mother was found to be a chronic schizophrenic. Her condition was basically untreatable, and rendered her incapable of effectively rearing a child).
[4] The parents had the potential for impulsive, irresponsible behavior and for loss of control in emotionally charged situations.
[5] See e.g. State v. Coleman, 490 So.2d 705, 707 (La. App. 1986).
[6] The Merck Manual, Ch. 139, p. 1499 (15th ed. 1987) states: "The recidivism rate for homosexual pedophilia is second only to exhibitionism, and ranges from 13-28% of those apprehended  roughly twice the rate of heterosexual pedophilia."