665 So.2d 1153 (1996)
Michelle SMITH, Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 94-2262.
District Court of Appeal of Florida, Fifth District.
January 12, 1996.
*1154 Eric Lee Bensen, Alexander Zouzoulas & Lori Wheeler, P.A., Orlando, for Appellant.
Lee Bernbaum and James A. Sawyer, Jr., Orlando, for Appellee.
PER CURIAM.
AFFIRMED.
DAUKSCH, J. concurs.
EVANDER, K.I., Associate Judge, concurs and concurs specially with opinion.
W. SHARP, J., dissents with opinion.
EVANDER, K.I., Associate Judge, concurring specially.
After considering the record in its entirety, I believe there was substantial competent evidence to support the trial court's finding of dependency. Specifically, there was evidence that the mother, Michelle Smith, had frequently struck the three older children with a brown stick, a belt, and her hands. Marks and bruises had been observed on the legs and buttocks of each of such children.[1] Additionally, the record reflects that Smith was not a stranger to the juvenile dependency court system. Her three older children had previously been found dependent in 1990 due to her physical abuse and neglect. The children were subsequently returned to her in August, 1992.
W. SHARP, Judge, dissenting.
Smith appeals from an order adjudicating her daughter, S.C., dependent. The trial judge found that Smith and S.C.'s father, Robert Corbett, had disciplined S.C.'s halfsiblings too harshly. S.C. was adjudicated dependent based solely on "prospective abuse." In my opinion, the evidence at the dependency hearing was insufficient to establish that S.C. was at substantial risk of imminent abuse or neglect and therefore I respectfully dissent.
"Abuse" is defined as "any willful act that results in any physical, mental or sexual injury that causes or is likely to cause the child's physical, mental or emotional health to be impaired." § 39.01(2), Fla. Stat. (1993). A child may be found to be dependent because of "abuse" under several circumstances. §§ 39.01(10)(a)-(e), Fla. Stat. (1993). They include when a child is found:
(a) To have been abandoned, abused, or neglected by [the] parents or other custodians.
* * * * * *
(e) To be at substantial risk of imminent abuse or neglect by the parent or parents or the custodian.
§ 39.01(10).
Pursuant to this statute, a child may be found to be dependent based upon a finding of risk of abuse as opposed to actual abuse, if the evidence at the hearing supports a finding that the risk is substantial. Richmond v. Department of Health and Rehabilitative Services, 658 So.2d 176 (Fla. 5th DCA 1995). A finding of risk of abuse may be based on proof of neglect or abuse of other children. See C.F. v. Department of Health and Rehabilitative Services, 649 So.2d 295 (Fla. 1st DCA 1995); In Interest of M.T.T., 613 So.2d 575 (Fla. 1st DCA 1993). See also Padgett v. Department of Health and Rehabilitative Services, 577 So.2d 565 (Fla. 1991). However, the evidence must establish that a child is at "substantial risk" of suffering abuse or neglect if left in the custody of a parent. This showing is generally based on evidence that the abusive or neglectful parent suffers from a condition that makes the prospect of future abuse or neglect of another child highly probable and there is no reasonable basis for improvement. See Richmond; Palmer v. Department of Health and Rehabilitative Services, 547 So.2d 981 (Fla. 5th DCA), dismissed, 553 So.2d 1166 (Fla. 1989).
In Palmer, this court upheld a termination of parental rights of one son (D.L.P.) based on prospective sexual abuse. In that case, Palmer sexually abused D.L.P.'s stepbrother (B.G.), for which he was convicted and sentenced to a sex offender program. He did not complete the program, however, because *1155 he was unable to benefit from it. The program director noted that he had shown little remorse for his sexual battery offense, he had a low capacity to evaluate his problems and behavior, and he had did not accepted responsibility for his behavior. A psychiatrist diagnosed Palmer as an untreated pedophile, opining that such an individual would be likely to repeat his sexual behavior when placed under stress or when indulging in alcohol. The psychiatrist further concluded that D.L.P. would be at risk if placed in Palmer's custody because he had a significant potential for abusing a youngster.
The issue in Palmer was whether his parental rights could be terminated based on prospective abuse. This court noted that the issue in prospective neglect or abuse cases is whether future behavior, which will adversely affect a child is predictable. It noted additionally that courts may find prospective neglect or abuse, if a parent is so afflicted that there is no reasonable basis for improvement. Acknowledging that psychological disorders involving persons of average intelligence often pose diagnostic problems, this court found, however, that pedophilia, had been studied extensively. Studies showed that there was no easy cure for the disorder and that the recidivism rate was extremely high. It found that the placement of a child with a person who suffers from this condition, was "tantamount to placing matches in a tinder box" because of the probability that the child would be sexually abused and because there was no reasonable prospect that the perpetrator would ever be cured. 547 So.2d at 984.
In Padgett v. Dept. of Health and Rehabilitative Services, 543 So.2d 1317 (Fla. 5th DCA 1989), approved, 577 So.2d 565 (Fla. 1991), this court also affirmed a termination of parental rights based on prospective abuse and/or neglect. The child at issue, W.L.P., had been taken from the Padgetts, his natural parents, immediately after his birth through a dependency proceeding and had remained in foster care since that time. At the termination hearing, evidence was presented that he would be subject to abuse and neglect if left with the Padgetts, who had been guilty of these offenses with other children. Admittedly, there was no evidence that they had abused or neglected W.L.P. since they had never had custody of him. Thus, the termination of parental rights was based solely on prospective abuse or neglect. Affirming the trial court, this court and certified a question to the supreme court concerning prospective abuse and/or neglect, as a question of great public importance. The supreme court approved this court's decision to affirm the termination of the Padgetts' parental rights. It found, however, the term "prospective" abuse, neglect or abandonment to be misleading, reasoning:
The term `prospective' simply means likely to happen. Although every termination case is prospective in the sense that it involves an element of speculation as to whether mistreatment will occur if the child is returned to the home, courts generally have reserved use of the term to characterize those termination cases where parental rights in a child are severed without evidence of abuse or neglect to that particular child. Parental rights are said to be terminated in such cases based on `prospective,' as opposed to `actual,' abuse of the child. We reject this analysis and point out that most such `prospective' abuse cases are in fact based on actual, documented mistreatment of other children and are no more speculative in nature than conventional termination cases involving prior abuse or neglect of the present, as opposed to some other child... . Such is the case in the present proceedings. To characterize these cases as `prospective,' thus implying that they are somehow more speculative than conventional cases, is misleading. We are not presented today with a truly `prospective' abuse case in which the state seeks to terminate parental rights based solely on prospective abuse, i.e., without evidence of actual abuse to any child, and we do not decide this issue.
577 So.2d at 566, n. 1.
The record showed that the Padgetts' other children had emotional and behavioral disorders, together with a low level of intelligence functioning. A clinical psychologist testified that in his opinion, these emotional disorders and low IQ were the result of *1156 having lived in a deprived environment. The psychologist also testified that two of the children showed signs of sexual abuse. The children's mother had abandoned them on several occasions and on other occasions, she had tied the children to the furniture, and left them. Additionally, HRS took one of W.L.P.'s siblings, a newborn, into custody after having received reports from hospital authorities that the mother was poking the child and engaging in other inappropriate conduct. A psychiatrist who examined the mother testified that she was a chronic schizophrenic, that she had a history of numerous psychiatric hospitalizations, and that her treatment prognosis was poor. In his opinion, the mother would never be able to effectively parent her child. Another expert testified that the risk of abuse to the child was very high. Finally, while the permanent commitment proceedings were pending, the mother staged a fake rape in which she abused herself and later reported to officers that she had been bound and raped by a neighbor, and she sexually abused a four-year-old child in her care.
Though the supreme court affirmed the trial court's order terminating parental rights, it declined to characterize the issue in the case as one of prospective abuse or neglect. The court noted that the mistreatment asserted by HRS as grounds for terminating the Padgetts' parental rights was actual, rather than prospective and had resulted in the permanent termination of parental rights in other children. The question posed by the court was whether the prior termination of parental rights in other children could serve as grounds for permanently severing the Padgetts' rights in the present child. After reviewing statutory law (chapter 39), case law, and strong public policy concerns, the court answered the question in the affirmative, reasoning: "In sum, to require a child to suffer abuse in those cases where mistreatment is virtually assured is illogical and directly adverse to society's fundamental policy of preserving the welfare of its youth." 577 So.2d at 570.
The court noted that parents have a longstanding and fundamental liberty interest in determining the care and upbringing of their children free from governmental interference, as balanced against the state's compelling interest in protecting its citizens, and particularly its youth, against the threat of abuse, neglect and death. Setting forth the standard for termination proceedings, the court reasoned as follows:
[W]e conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child. Implicit in this standard is the basic requirement that, under ordinary circumstances, the state must show that the parent abused, neglected or abandoned a child. The question before us today is whether this abuse, neglect or abandonment must concern the present child, or whether it can concern some other child. Based on our above analysis, we hold that the permanent termination of a parent's rights in one child under circumstances involving abuse or neglect may serve as grounds for permanently severing the parent's rights in a different child.
We note that because parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm. This means that HRS ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child. We additionally point out that factors related to a parent's lack of financial resources cannot support permanent termination of parental rights... . As is apparent from the above analysis, a parent's intelligence level ordinarily is irrelevant to this inquiry. (footnotes omitted).
577 So.2d at 571.
Thus, prospective abuse or neglect or "derivative" abuse or neglect, as it is called in other jurisdictions,[1] is clearly a sufficient basis *1157 for termination of parental rights or dependency adjudication provided at least two elements are established. First, abuse or neglect of another child must be clearly established. In Interest of M.T.T., 613 So.2d 575 (Fla. 1st DCA 1993), the first district affirmed an order adjudicating M.T.T. to be dependent based on clear and convincing evidence of egregious prospective abuse. The mother had a past history of attempted suicide by drug overdose and had attempted to slash her wrists. Additionally, M.T.T.'s sister had died from a drug overdose which police believed to have been a homicide. Accidental exposure to the drugs was ruled out because of the deceased infant's lack of access to the child-proof bottle of drugs. See also C.F. v. Department of Health and Rehabilitative Services, 649 So.2d 295 (Fla. 1st DCA 1995) (child declared dependent based on death of her younger sibling while in the care of her father).
In In Interest of Baby Boy A, 544 So.2d 1136 (Fla. 4th DCA 1989), the fourth district upheld an order terminating the father's rights to his child. The father was convicted and incarcerated for aggravated child abuse upon the child's older brother. He was also on parole for a manslaughter conviction in another state and was wanted for a parole violation. The court recognized that the court need not wait until prospective neglect or abuse occurs before severing parental ties. Thus, even though the father had never been offered a performance agreement, the trial court found clear and convincing evidence of prospective abuse or neglect sufficient to terminate his parental rights.
The second element that must be established to prove prospective abuse or neglect is the parent's prognosis for improvement or rehabilitation and a high likelihood that his or her condition will result in the abuse or neglect of other children. For example, in In Interest of W.D.N., 443 So.2d 493 (Fla. 2d DCA 1984), the second district affirmed the trial court's termination of the mother's parental rights to her three children even though one had not been abused. In that case, the mother's older children had been declared dependent based upon abuse, including bone fractures to the children. A psychiatric examination of the mother indicated that she was a poor candidate for therapy to teach her parenting skills because she had a limited intellectual capacity and was only marginally capable of caring for herself. The mother did not admit she had a problem even after attending all available programs. Finally, there was expert testimony as to a high risk of additional abuse if the children remained with the mother.
On appeal, the second district noted that parental abuse of some of her children may constitute grounds for commitment of other children who also live with the parent. The court stated:
To continue to expose children to abuse by a parent simply because findings of prior abuse by the parent only concerned others of the parent's children would constitute an unacceptable risk to the children where, as here, the mother's propensities in that regard were shown to be beyond reasonable hope of modification. (emphasis added)
*1158 443 So.2d at 493. See also Application of L.L., 653 A.2d 873 (D.C. 1995) (a parent's propensity to abuse other children, when shown to be beyond reasonable hope of modification, may constitute too great a risk to any remaining child to permit a continued parental relationship).
Where the second element for proving prospective abuse or neglect is missing, a dependency adjudication or a termination of parental rights is not warranted. For example, in Fetters v. Department of Health and Rehabilitative Services, 589 So.2d 959 (Fla. 5th DCA 1991), this court reversed an adjudication of dependency for the natural child of Fedders. The child had been adjudicated dependent almost entirely because the father had physically abused a stepchild. Although the father had emotional and psychological problems, there was no evidence that he had abused his natural child. Thus, this court found the facts and circumstances legally insufficient to support a dependency adjudication. Similarly, in Fielder v. Department of Health and Rehabilitative Services, 596 So.2d 520 (Fla. 5th DCA 1992), this court reversed an order adjudicating the father's natural children dependent based upon the sexual abuse of an unrelated minor child in his care. Again, this court found the evidence legally insufficient to support a finding that the father's natural children were at risk.
Finally, in Paquin v. Department of Health and Rehabilitative Services, 561 So.2d 1286 (Fla. 5th DCA 1990), Paquin appealed from an order finding his three children to be dependent. There was evidence that he had abused his eight-year-old daughter in the presence of his six-year-old son. Based on this abuse, the dependency adjudication of these two children was affirmed. However, no evidence was presented that Paquin's two-year-old daughter, who did not live in the same household with the other two children, had ever been abused, had witnessed any abuse or might be subjected to abuse in the future. Accordingly, the portion of the order finding this child to be dependent was reversed.
In the present case, Smith's daughter, S.C. was a one-and-one-half-year-old infant. Smith has three other children: M.P., C.S., and L.S. Robert Corbett is S.C.'s biological father and stepfather of the other children. The evidence at the hearing showed that on one occasion Corbett struck his eight-year-old stepdaughter L.S., with a stick; as a result of which she suffered a broken wrist. This incident occurred after L.S. and her siblings had continued playing and talking in their room after being told to go to sleep. Smith was not home when the incident occurred.
At the dependency hearing, L.S. testified that she had been hit only once in this manner and that Corbett had never hit the other children with a stick. The child also testified that Smith and Corbett would sometimes "whoop" her and her siblings when they did something wrong. Most of the time, however, she was merely required to go to her room for a "time out." When asked if she always minded her mother, L.S. testified: "Sometimes I do and sometimes I don't." L.S. testified that neither Smith nor Corbett had ever hit S.C. There was no evidence that S.C. had ever been physically abused.
The HRS case worker was qualified to testify regarding the physical abuse of the children. There was no expert testimony regarding emotional abuse of the children. The HRS worker assigned to this case testified there were no substantiated allegations regarding any type of abuse of any of the children, with the exception of the incident involving L.S.'s wrist. The case worker admitted that other than the wrist incident, the bruises received from the "whoopings" by the older children did not cause any significant impairment to their physical health and thus, did not constitute child abuse, as defined by the statute.[2] In fact, the case worker testified that only L.S. had been physically abused, and her abuse was based solely on one incident involving her broken wrist. Thus, proof of actual abuse of a child in this case was minimal.
Conspicuously absent from this record is any testimony regarding the emotional or physiological condition of either Smith or *1159 Corbett, whether one or both were suffering from an emotional or psychological condition which would cause them to abuse S.C., whether the likelihood they would abuse S.C. was great, and whether Smith lacked the ability or resources to protect S.C. from future abuse by Corbett. Thus, in my view, the evidence adduced at the hearing was clearly insufficient to establish that S.C. was at "substantial risk of imminent abuse or neglect" while in the custody of her parents. The dependency order should therefore be reversed.
The concurring opinion notes that Smith was not a stranger to the juvenile dependency system and that her three older children had previously been found dependent in 1990 due to her physical abuse and neglect. It is correct that Smith had been convicted of child abuse of L.S., after the child suffered "non-accidental" burns, and the children were taken away from her. However, Smith complied with HRS' requirements and the children were returned to her in August 1992. S.C., the only child whose dependency is at issue in this appeal, was not born until December 1992. Since Smith complied with HRS' requirements and was deemed fit to have her children returned to her, this fact should not be held against her in the dependency matter regarding S.C.
The concurring opinion also states that there was evidence that Smith had "frequently" struck the three older children with a brown stick, belt and her hands and that marks and bruises had been observed on the other children. L.S. did testify that her mother hit the children (not S.C.) but with a brown stick and a belt. However, the evidence does not appear sufficient to establish that Smith "frequently" hit her children:
[Smith's Counsel Eric Benson]
Q. Now when your mom  you said your mom hit you with a belt.
[L.S.]
A. Yeah.
Q. What  what would the punishment be most of the time, though, when you did something wrong? Would it be that you'd have to go to your room and time-out type of thing? Would that be most of the time?
A. She would make me go in my room and sit down on the bed, no laying down, no sleeping, no TV.
Q. Are you ever bad?
A. Yeah.
Q. Okay. And when you're bad, most of the time is that what your mom makes you do is go sit in your room?

A. Yeah.
Q. Okay.
A. Most of the time when I bad, she don't make me go in the room. When I really bad, she'll make me go in the room.
Q. Okay. Do you ever not do what your mom tells you to do?
A. No.
Q. You always mind your mom?
A. Sometimes I do, and sometimes I don't.
Q. Yeah. Now, when your mom hits you with the belt, you said she its you on your butt or your hands?
A. She'll hit me on my butt or my hands.
Q. Okay. Is that after you've done something bad?
A. Yes.
Q. She doesn't do that all the time, does she?

A. No.

Q. Just when you're real bad, is that when it happens?
A. Yes.
Q. Okay. Did you ever have to go to a doctor or anything like that? You didn't have to go to a doctor for being hit with a belt, did you?
A. No.
Q. Okay. And how about your  your other brother and sisters, how would your mom punish them? Would she send them to their room, too, when they were bad?
A. Yes.
Q. Okay. And you said that you'd see  you've never  you've seen your mom hit [M.P.] with the belt too. You said you've see that. You're kind of hesitant *1160 about that. Do you know what that means, hesitant? You weren't sure that  whether you saw your mom hit [M.P.] or not.
A. No.
Q. (Interposing) But I know she never hit Ponanny (phonetic), I mean, [S.C.].
THE COURT: Never hit what?
BY MR. BENSEN:
Q. She never hit [S.C.]. Are you not sure, or are you sure that she hit [M.P.] with a belt before?
A. Not sure.
Q. You're not really sure about that, are you?
A. No.
Q. Okay. But she might have?
A. Yeah.
Q. Okay. And would that have been when [M.P.] was acting real bad?
A. (No verbal response)
Q. Yes.
A. Yes.
Q. Okay. Now how about [C.S]? Does [C.S.] always mind your mom?
A. Sometimes.
Q. Sometimes he does.
A. Mostly  mostly all the time.
Q. Mostly all the time, but sometimes he doesn't?
A. Mostly he never get whoppings.

Q. Yeah.
A. Mostly he listen all the time.
Q. Okay. So what you're saying is that if [C.S.] ever does something bad, he  he ...
A. (Interposing) He don't get no whopping.
Q. He doesn't get whippings?
A. But if he do  if he do, that mean he do get a whopping.
Q. If he acts real bad, he does get a whopping?
A. Yeah.
Q. Okay. And he gets a whopping on the butt with a belt?
A. Yes.
Q. Okay. Well, it hurts you, doesn't it, when you get a whopping?
A. (No verbal response)
Q. Yes?
A. Yes.
Q. Okay. Well, is that a  does that make you mind, then, later?
A. Yes.
Q. Okay. And does your mom try to talk to you first and say, hey, guys, don't do that?

A. Yes.
Q. And then if you keep doing it, then  then she may send you to your room?

A. She will whop us or send to our room.

Q. Whip you or send you to your room, okay.
A. Yeah. (emphasis added)
The HRS caseworker, Ms. Harju, testified that the three children had bruises on them. Based on these bruises, Ms. Harju was of the opinion that S.C.'s siblings, were physically "abused." Apparently HRS guidelines provides that any bruise that lasts more than twenty-four hours on a child is considered "abused." However, Ms. Harju admitted that the HRS guidelines were more restrictive than the dependency statute. Obviously, the statute is controlling in these cases. Under the dependency statute, Ms. Harju did not consider the children (other than L.S. based on the wrist incident) to be abused:
Q. [SMITH'S COUNSEL ERIC BENSON] Okay. Well, let me ask you a question then. Again, we're trying to focus in, you made a statement  blanket statement that these kids were abused. I guess I have to be very, very restrictive in my question.
A. You restricted my statement.
Q. Okay. In your opinion, was [C.S.] physically abused as a result of these marks?
A. No.
Q. No. Okay. Now, let's go to [M.P.] In your opinion, as a result of  how many marks did we see on [M.P.]; one?
A. She had on lateral mark on her thigh.

*1161 Q. One on the thigh. As a result of this mark that you observation [M.P.'s] thigh, in your opinion, was she abused?
A. No.
Q. Okay. And we've got [C.S., M.P., S.C.] no marks on her. Do you consider her abused?
A. Physically?
Q. Physically abused.
A. No.
Q. No. And [C.S.]. [C.S., M.P.]...
A. (Interposing) We already did [C.S.].
Q. [C.S.], [M.P.], [S.C.]. Other than that one mark, do you consider her abused, other than the one, excluding ...
[HRS COUNSEL] (Interposing) Who  who are you asking about?
THE WITNESS: Who are you talking about?
MR. BENSEN: [S.C.].
THE WITNESS: We just did [S.C.].
MR. BENSEN: I'm sorry, [L.S.].
THE COURT: Other than the one mark, was she physically abused?
THE WITNESS: No.
BY MR. BENSEN:
Q. Did you see any other marks on her?
A. No, not that I recall.
Q. Okay. So, just to clarify everything, in your opinion, only one child was physically abused and that's [L.S.], and that is as a result of your observations of the wrist.

A. Correct. (emphasis added).
Even if the evidence in this case were deemed sufficient to show abuse of the other children, there was no testimony regarding Smith's or Corbert's emotional condition and no medical or psychological evidence that it was likely that they would physically abuse S.C. Without such evidence, HRS is not entitled to an automatic dependency determination, after one child is determined to have been abused. While in the end it may be appropriate to have S.C. declared dependent, HRS should be required to show something more than one incident of abuse of another child by the child's stepfather outside the presence of the mother.
NOTES
[1] Although the HRS case worker opined that there was only one incident which resulted in a physical injury that caused or was likely to cause the child's physical, mental or emotional health to be "significantly impaired," the trial court was not required to accept such opinion.
[1] The courts in New York refer to "derivative" abuse or neglect rather than prospective abuse or neglect. For example, in Matter of Amanda LL, 195 A.D.2d 708, 600 N.Y.S.2d 298 (N.Y. App. Div. 1993), the New York Supreme Court noted that in appropriate circumstances, the finding of abuse of one child can support a finding of derivative abuse or neglect as to the other children. These circumstances include the nature of the direct abuse, notably its duration, the circumstances surrounding its commission and whether, on the whole, it can be said to evidence fundamental flaws in the individual's understanding of the duties of parenthood. See also Dutchess County Department of Social Services on Behalf of Douglas E., III v. Douglas E., Jr., 191 A.D.2d 694, 595 N.Y.S.2d 800 (N.Y. App. Div. 1993) (focus of inquiry to determine whether derivative neglect is present is whether evidence of abuse or neglect of one child indicates fundamental defect in parent's understanding of duties of parenthood; flawed notions of parental responsibility are generally reliable indicators that parent who has abused one child will place his or her other children at substantial risk of harm). The Family Courts of New York have held that a finding of derivative abuse or neglect would be proper if (1) the offensive conduct proven as to one child was not remote in time, (2) the conduct was serious or involved a course of abusive or neglectful behavior and (3) the conduct demonstrated a fundamental defect in the individual's understanding of the duties and obligations of parenthood. Matter of Aaron S., 163 Misc.2d 967, 625 N.Y.S.2d 786 (N.Y. Fam. Ct. 1993), affirmed, ___ A.D.2d ___, 626 N.Y.S.2d 227 (N.Y. App. Div. 1995); DSS on Behalf of Moria I. v. Manuel S., 148 Misc.2d 988, 563 N.Y.S.2d 592 (N.Y. Fam. Ct. 1990).
[2] § 39.01(2), Fla. Stat.