36 So.3d 776 (2010)
N.S. and D.R., Appellants,
v.
The DEPARTMENT OF CHILDREN AND FAMILIES and The Guardian Ad Litem Program, Appellees.
Nos. 3D09-2019, 3D09-2020.
District Court of Appeal of Florida, Third District.
May 12, 2010.
Rehearing and Rehearing En Banc Denied June 25, 2010.
*777 Thomas J. Butler; Albert Guffanti, Miami, for appellants.
Karla Perkins, Assistant District Legal Counsel, Department of Children and Families; and Hillary Kambour, Guardian Ad Litem Program, for appellees.
Before GERSTEN, SHEPHERD, and SUAREZ, JJ.
SUAREZ, J.
The Father (D.R.) and Mother (N.S.) of the minor children seek to reverse a final order terminating their parental rights. We affirm.
The record shows that the three minor children were placed in shelter care after the Mother was found wandering the street with them at four in the morning; the children were hungry and dirty. The Mother was unable to say where she lived. The children were found to have multiple health problems related to poor nutrition and lack of hygiene; all three were developmentally delayed. After investigation by the Florida Department of Children and Families ["DCF"] and the Guardian ad Litem ["GAL"] appointed to represent the children's interests, DCF subsequently filed a dependency petition alleging that the Mother, who is mentally impaired and homeless, is unable to care for her children. DCF also alleged that the Father of one of the children, D.S.[1], should have known that his child was homeless, should have assisted, but failed to support and care for his child, and failed to protect the child from an inadequate custodian, i.e., the Mother. The court adjudicated the children dependent as to both parents.
DCF placed the children in foster care in 2007, with a plan for reunification with the Mother. The Mother completed her required referred services, but because two separate psychologists opined that she could still not ever, realistically, safely parent the children on her own because of her limited intellect, the GAL moved for a change of goal from reunification to adoption. In addition, the GAL expressed concern that, although the paternal grandmother had been actively involved with the Mother and children prior to the shelter hearing, she had done nothing to ameliorate the children's detrimental living conditions and resulting ill health and developmental delays.
The Father was incarcerated throughout this period. He was given pre- and post-dependency referrals for substance abuse counseling and parenting classes. The record shows that the Father refused to attend the referred services, and did not have the ability to maintain a household or provide a stable environment for his child, D.S. He has not sought to visit or support D.S. but, rather, expressed a desire to have his grandmother care for the child. *778 The paternal grandmother expressed an interest in having the Mother and children live with her, but the home study revealed that her home was inadequate to support three children and the Mother, and that she herself was too elderly to manage that household. A cousin expressed an interest in assisting with caring for the children, but did not express a desire to become the permanent guardian or to adopt.
The children have been evaluated since they entered foster care in 2007 with a caregiver who seeks to adopt them and is willing to keep them bonded with the Mother. The children have thrived in foster care, and have markedly improved in both physical and mental health. The record reflects that there are no other relatives to competently care for the children. The final judgment terminating both parents' rights was entered in June 2009, and in that order the judge made detailed factual findings and legal conclusions pursuant to statutory requirements. Both parents appeal.
We are very mindful that parental rights constitute a fundamental liberty interest. Padgett v. Dep't of Health & Rehab. Servs., 577 So.2d 565, 570 (Fla.1991) (citations omitted). Thus, in order to terminate parental rights, DCF must proceed in a narrowly tailored manner and must prove that, in addition to the statutory requirements for termination of parental rights, that termination is the least restrictive means of protecting the child from serious harm. Id.; § 39.806(1)(c), Fla. Stat. (2009). As the court in Padgett explained, the least restrictive means test means simply that "[DCF] ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child." Padgett, 577 So.2d at 571; L.D. v. Dep't of Children & Family Servs., 957 So.2d 1203 (Fla. 3d DCA), review denied, 967 So.2d 197 (Fla.2007); see also In re K.W., 891 So.2d 1068, at 1070 (Fla. 2d DCA 2004) ("Padgett describes the least restrictive means as those that offer the parent a case plan and time to comply with the plan so as to obtain reunification with the child."); B.C. v. Fla. Dep't of Children & Families, 887 So.2d 1046, 1050 (Fla. 2004) (requiring application of the least restrictive means test to termination proceedings pursuant to section 39.806(1)(d)1., which applies in instances where a parent has been incarcerated); Fla. Dep't of Children & Families v. F.L., 880 So.2d 602 (Fla.2004); In re T.M., 641 So.2d 410, 412-13 (Fla.1994) (holding that the least restrictive means analysis requires only that state prove good faith effort to rehabilitate parent and unify family by providing case plan and related services); A.J. v. K.A.O., 951 So.2d 30, 32 (Fla. 5th DCA 2007) (same). The least restrictive means test is not intended to preserve the parental bonds at the cost of a child's future. A.J., 951 So.2d at 30.
With that in mind, the record contains competent and substantial evidence that the Father failed to complete pre-and post-dependency referrals for substance abuse and parenting as set forth in the case plan, failed to financially support his child or provide adequate housing or medical care for that child, failed to consistently visit with the child, and lacks the disposition necessary to provide his child with food, clothing, medical or other remedial care. The Father did not express a desire to take on the responsibility of a full-time parent but would rather the elderly grandmother care for the child and siblings where it is apparent that she is an inappropriate caretaker. The Father is, essentially, challenging the dependency order's findings that he failed to protect the child from the Mother. He cannot now, however, *779 collaterally attack the dependency order after the entry of a final order terminating his parental rights.
We find that DCF made reasonable efforts in good faith to rehabilitate the Father and reunite him with his child through a detailed case plan, and that the record contains clear and convincing evidence that the Father failed to comply. See J.R. v. Dep't of Children and Family Services, 754 So.2d 714 (Fla. 4th DCA 1998) (affirming termination of parental rights where clear and convincing evidence showed that the parent failed to substantially comply with case plan). We agree with the trial court that termination of the Father's parental rights was the least restrictive means of protecting his child D.S. from harm, and will allow D.S. to achieve permanency and stability in his life. We affirm the order terminating the Father's parental rights as to his child, D.S.
As to the Mother, we find competent and substantial evidence in the record that the Mother's intellectual deficits resulted in actual physical and psychological harm to the children, although the record also shows that she loves her children and that they are bonded with her. The record contains expert testimony that the Mother's low functioning intellect prevents her from ever safely parenting the children on her own and, despite the provision of social services, there is no reasonable basis to believe that she will improve. Although a parent's intelligence level ordinarily is irrelevant to the inquiry, see Smith v. Dep't of Health & Rehab. Servs., 665 So.2d 1153 (Fla. 5th DCA 1996), we find, as did the court in A.W. ex rel. B.W. v. Dep't of Children & Families that:
Appellant's low I.Q. and mild mental retardation render her unable to learn the basic parenting skills necessary to rear her child, despite Appellant's intermittent, incomplete efforts to do so. It is not unreasonable to conclude that Appellant remains basically dependent herself. Therefore, although she is a loving parent who technically performed all the superficial tasks set out in the case plan, Appellant failed to demonstrate her ability to comprehend what the case plan requires in terms of implementing the basic skills necessary to be an effective parent. In other words, the record demonstrated that Appellant could not achieve a level of comprehension and behavior necessary to ensure B.W.'s health, safety, and well-being irrespective of the Department's provision of more services. Appellant's acts and omissions simply did not square with the Florida Legislature's definition of "substantial compliance." See § 39.01(71), Fla. Stat. (2006).
A.W., 969 So.2d at 503. We agree with the trial court that, should the children remain in her care, there is risk of prospective harm to them as well.
The existence of possible placement with a relative is irrelevant to the least restrictive means test, where DCF made reasonable efforts to rehabilitate the Mother and provide services to her and her children with the goal of reuniting them as a functional family. See R.L. v. Dep't of Children and Families, 955 So.2d at 1240 (Fla. 5th DCA 2007) ("The existence of a long-term relative placement is not the `dispositive constitutional consideration' in applying the least restrictive means test."); In re K.W., 891 So.2d at 1070. Although a relative came forward, it was with the offer to assist with the care of the children, not to adopt or to become a permanent guardian. As the record makes clear, the paternal grandmother was not a suitable placement for the Mother and children. We agree with the trial court that there is compelling and substantial evidence that the Mother is unable to safely parent the *780 children, and especially where the court heard evidence that the foster Mother is willing to adopt and to maintain regular contact between the Mother and her children in order to maintain their parent/child bonds. We find substantial and competent evidence in the record to support the trial court's required statutory findings, and conclude that the court correctly applied the least restrictive means test as to the Mother. We agree with the trial court's determination concerning the manifest best interest of the children and affirm the order terminating the Mother's and Father's parental rights.
Affirmed.
GERSTEN, J., concurs.
SHEPHERD, J., concurring in part, dissenting in part.
This case concerns the extremely difficult issue involving the rights of mentally retarded persons to parent and live their lives as normal as possible and the State's obligation to encourage and support that right.[2] I begin by noting we are well-past the point of judging whether or not the mother, N.S., exercised good judgment in having the three young children involved in this case, or even the extent to which she was equipped to make that judgment. It is a fait accompli. We have no reason to believe she did not want these children, or lacked the ability to consent. Moreover, although she loves these children and "maintains a significant attachment and bond with them," through no fault of her own, she lacks the mental capacity to care for them on her own.
Dr. Sandra Klein, one of the two expert psychologists who testified at the termination of parental rights hearing, captured this case in its essence:
[This] is a very sad case. This is not a mother who isthis is not a mother who is a malicious, malevolent, intent individual who purposely wanted to harm her children. This is a mother who has three children who is very limited IQ wise and because of that limitation impairs her ability to care for her children. The low level of IQ is not [her] fault.
She did not take drugs and become mentally retarded. She did not become involved in a reckless accident and become mentally retarded. This is something that wasn't made [by her], she was born with this.... There is a bond [between this mother and her three children], she is connected.
Although it is my clinical impression that independently on her own [ ]the chances of her ever being able to come to the point of caring for her children on her own are almost non existent. However that doesn't mean that she doesn't deserve, you know, to love her children or for her children to know her or to be nurtured by her.... They're going to surpass her like I previously indicated. But this is [t]he[i]r mother and she is very motivated to do what she can for these children. Her basi[c] difficulty is her IQ and she can not (sic) fix that. There is no cure for developmental delay. I can't fix it, she can't fix it....
Legally, we are called upon to resolve the conundrum in this case through application of the "least restrictive means" test, a judicially mandated appendage to Florida's termination of parental rights statute, § 39.806, Fla. Stat. (2009), in recognition of the fact that in our society, "a parent has a *781 natural God-given legal right to enjoy the custody, fellowship and companionship of his offspring. This is a rule older than the common law itself...." Padgett v. Dep't of Health & Rehab. Servs., 577 So.2d 565, 570 (Fla.1991) (quoting State ex rel. Sparks v. Reeves, 97 So.2d 18, 20 (Fla.1957)). In application, as our Supreme Court has held, this means that when the state infringes upon such a right, it must do so in the "most narrowly-tailored" and "least intrusive" manner consistent with the object to be accomplished. N. Fla. Women's Health & Counseling Servs. Inc. v. State, 866 So.2d 612, 641 (Fla.2003).
In the usual case, satisfaction of this test is relatively uncomplicated. Typically, an "offending parent" has intentionally abandoned his child, abused the child, intentionally or recklessly exposed the child to danger, abused drugs or alcohol to the detriment of the child, or become incarcerated. A cursory review of the cases relied upon by the majority demonstrates that each emanates from such a self-inflicted parental flaw. See Fla. Dep't of Children & Families v. F.L., 880 So.2d 602, 605 (Fla.2004) (actual abuse, drug abuse, and domestic violence); B.C. v. Fla. Dep't of Children & Families, 887 So.2d 1046, 1048 (Fla.2004) (incarceration); In re T.M., 641 So.2d 410, 410 (Fla.1994) (actual abuse and incarceration); Padgett, 577 So.2d at 568 (actual abuse); A.J. v. K.A.O., 951 So.2d 30, 32 (Fla. 5th DCA 2007) (abandonment and incarceration); In re K.W., 891 So.2d 1068, 1069 (Fla. 2d DCA 2004) (drug abuse).[3] In such a case, as stated by the majority, "[DCF] ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or such other plan for the present child." See Maj. op. at 778 (citing Padgett, 577 So.2d at 571) (emphasis added). If the Department makes the effort and the parent does not respond, the element is satisfied. See, e.g., In re K.W., 891 So.2d at 1069.
However, our case is not an ordinary case. There was no needexcept perhaps for confirmatory purposesto offer N.S. a case plan. Case plans do not improve IQ.[4] Nevertheless, N.S. eagerly embraced every service the Department had to offer her and completed her plan. Unremarkably, the experts' assessment of N.S., after her journey through the system, was the same as before she began that journey: she wants to parent, but cannot do so without assistance.
It is at this juncture I believe this case fails of proof and should be remanded for further proceedings. The purpose of the Florida Department of Children and Family Services is to serve. The Department has yet to offer a meaningful service to N.S. The only meaningful service it can offer N.S. is an effort to determine whether there is a suitable relative or other placement for N.S. and her children whereby she can exercise the fundamental *782 right to motherhood our society promises every child-bearer (or father) wherever it can be had, the mentally impaired being no exception. Such an arrangement, if it were to be found, would ensure the rights of both the mother and the children are fully protected.
The Department offered no proof at the trial that it made any effort to inquire about the availability of such an arrangement. The case plan requirements, imposed by the Department on N.S. before it decided to terminate her parental rights, were taken from a page of those that the Department would require of an "offending parent" who had the ability to rehabilitate herself and achieve reunification with her children: a psychological evaluation, parenting classes, refrain from criminal activity, stable housing and child support. The document includes no mention of a "plan" to search for an alternative longterm placement with a relative or friend whereby N.S. could live with and parent her children, and there is indeed no evidence such a solution was given any studied deliberation by the Department or Guardian despite the fact that N.S. has a large extended family located in Miami-Dade County.
To the contrary, the Department, the Guardian ad Litem, and the trial court operated under a paradigm placing the burden upon mentally deficient N.S. to come forward with a solution satisfactory to the court, and in failing to do so, she would lose her children. When a paternal great grandmother came forward, the Department and Guardian adjudged her unqualified because she already had been involved in the children's lives and had failed to remedy the problem. With only the most cursory degree of consideration, an offer from a cousin to become involved was rejected because her offer, from the witness stand, was not sufficiently adequate. The trial judge was concerned. As he stated during an especially revealing cross-examination of the case manager, during which counsel for the mother elicited the fact that the plan for N.S. reflexively (and abruptly) changed from reunification to termination at the Guardian's insistence upon confirmation of the mother's inability to parent without assistance, "I think it's important here to know if the mother received competent services and it's a very important issue." The fact of the matter is that after her IQ was determined, no further services were offered to N.S., including the most important of all, establishing whether or not there was some alternative permanent arrangement or placement in which N.S. could live her life and parent her children; and the position of both the Department and Guardian was that such was not necessary to termination in this case. As the Department stated in its final argument, "[all] the least restrictive means test means [is] that we made a good faith effort to rehabilitate the parent and unite a family such as through a case plan and other case plans with the family." Counsel for the Guardian dutifully adopted this argument in his own closing argument. The trial judge ultimately capitulated, "[T]he children have to be returned as long as the parent comes up with a way of being able to parent with assistance." (Emphasis added).
Of course, not only is this paradigm illogical in the circumstance of a case like this but, more importantly, it is contrary to law. It is apodictic in a termination of parental rights case that the Department has the burden to prove termination is the least restrictive alternative to satisfy the State's obligation to protect the child. See L.B. v. Dep't of Children and Families, 835 So.2d 1189, 1195 (Fla. 1st DCA 2002). It is equally incontrovertible that the Department must prove this element, as with all other elements of a termination case, by *783 clear and convincing evidence. See § 39.809(1), Fla. Stat. (2009); N.L. v. Dep't of Children & Family Servs., 843 So.2d 996, 999 (Fla. 1st DCA 2003). A cursory review of the record reveals the government was not held to this level of obligation. In fact, the Department's case coordinator, Lucy de Lange, testified she was unaware of "any [departmental] courses that provide services to developmentally delayed parents [such as N.S.] and another relative that would be able to co-parent with them." There is reason to believe the Department is not ordered in such a way to effectively handle a case like this.
The Department places its primary reliance for affirmance on A.W. ex rel. B.W. v. Dep't of Children & Families, 969 So.2d 496 (Fla. 1st DCA 2007). However, in that case, not only did there exist "little bonding" between the child and the mentally impaired mother, there was record evidence the mother had engaged in physical abuse toward the child, and exhibited "anger management issues and a low frustration tolerance" that placed the child "at risk." Id. at 500-02. Unlike the case before us, the mother in A.W., albeit mentally deficient, was also an "offending parent." See supra at 781.
Justice Barkett's specially concurring opinion in Padgett aptly articulates the crucial legal (and moral) difference between a mother whose only sin is that she has deficient parental capabilities for reasons beyond her control, and the same parent who has additionally engaged in some form of actual physical, emotional, and/or sexual abuse of her child:
I write to emphasize that the evidence necessary to terminate parental rights is not simply the bare assertion of an expert that parents lack the "capacity to parent their child." Rather, the decision must be supported by factual evidence of actual physical, emotional, and/or sexual abuse.
Permanent severance of the parent-child relationship is a serious matter that involves constitutionally protected liberty interests. The United States Supreme Court has stated:
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.
To ensure that the rights of both parent and child are fully protected, the reasons for the permanent termination of parental rights must go far beyond the fact that others may be more capable of caring for the child....
Clearly, conclusions that parents manifest a low level of intelligence or lack emotional and cognitive resources by themselves would not be enough to terminate parental rights. Those characterizations undoubtedly describe thousands of individuals who are now, and will continue to be, loving parents. Such findings are a far cry from clear and convincing proof of abuse, neglect, or abandonment.
....
[B]ecause parental rights are recognized as a fundamental liberty interest, the state must prove that termination of those rights is the least restrictive alternative.... Termination of parental rights should be the remedy of last resort, employed only when other reasonable alternatives have been exhausted.
Padgett, 577 So.2d at 572 (internal citations omitted).
*784 I find no evidence in the record, pursuant to which I can comfortably conclude, that the Department, Guardian, or even the court made the effort to ascertain whether a permanent arrangement existed with a relative or friend in which N.S. and her children's express desire that they remain together could be preserved. Because the burden lies with the Department to prove by clear and convincing evidence that termination is the least restrictive means available to both protect the children and at the same time honor N.S.' fundamental right to parent, to which we as a society are pledged, I would reverse this case and remand it for re-adjudication of the children as dependent, without prejudice to the Department to re-institute termination proceedings, if appropriate, at such time as it is evident termination of N.S.' rights is the least restrictive alternative available to protect the life, safety and health of these children. See § 39.811, Fla. Stat. (2009); J.J. v. Dept. of Children & Families, 886 So.2d 1046, 1048 (Fla. 4th DCA 2004).
In so doing, the Department should be reminded that the elements of the "least restrictive means" test, requiring a showing that termination of parental rights is the least restrictive means of protecting the child from serious harm, are separate from, and not to be confused with the "manifest best interest" test. Id. (describing a two-step process inherent in statutory scheme for termination of parental rights in which the manifest best interest test is addressed only after one of the grounds for termination under section 39.806 has been proven); accord V.J. v. Dep't of Children & Family Servs., 949 So.2d 1128, 1129 (Fla. 3d DCA 2007). It is quite apparent from the record the foster parents desperately wish to adopt these children. The record contains substantial evidence from which one might conclude these children would be "better off" if they were adopted by their current foster parents. However, "the fact that a child may be better off materially or otherwise with the prospective adoptive parent[s] should never become the focal point in a termination proceeding." In re E.C., 33 So.3d 710 (Fla. 2d DCA 2010) (citing Kingsley v. Kingsley, 623 So.2d 780, 788 (Fla. 5th DCA 1993)). A review of the record shows, while understandable, albeit legally unacceptable, it is this all too human sentiment that infected the Department's handling of this case and carried it to its predictable end. In so doing, the system benignly skirted its central, prescribed dutythe preservation of the family unit wherever that is reasonably possible.
I would reverse the termination of parental rights as to N.S.
NOTES
[1] The Father of D.S. is not married to the Mother; the father of the two remaining children are unidentified.
[2] I dissent only from the majority's approval of the termination of parental rights of the mother in this case. I concur in the majority's affirmance of the termination of parental rights of the father, D.R., which is also the subject of this appeal.
[3] Along with these cases, the majority also cites L.D. v. Dep't of Children & Family Servs., 957 So.2d 1203 (Fla. 3d DCA), review denied, 967 So.2d 197 (Fla.2007), to support its holding that the Department's obligation to N.S. was "simply" to offer her a case plan and services before proceeding to termination. See Maj. Op. at 778. To the contrary, in L.D., we reversed a termination of parental rights because, inter alia, the Department failed to prove actual abuse, i.e., the required "nexus between the mother's conduct of drinking alcohol and harm to the child," id. at 1205, and the least restrictive means test because the Department failed to do a home study or other investigation to determine whether there was a suitable permanent custody arrangement with a relative. Id. at 1207.
[4] N.S. has an IQ of 55. Her IQ score places her in the bottom one percent of the population in this regard.