970 So.2d 395 (2007)
J.O., Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
No. 3D07-595.
District Court of Appeal of Florida, Third District.
November 7, 2007.
Kevin Coyle Colbert, Miami, for appellant.
Karla Perkins, Miami; Hillary S. Kambour, for appellee.
Before GERSTEN, C.J., and RAMIREZ, and SHEPHERD, JJ.
PER CURIAM.
The father, J.O., appeals an order adjudicating his minor children, C.O. and J.O., dependent. Because we conclude that the children's physical and mental health were at substantial risk of imminent harm, we affirm the trial court's order.
In August of 2005, the Department of Children and Family Services ("Department") received an abuse report indicating that a step-sibling of J.O. and C.O. shot another step-sibling at the home of their biological mother. The father, J.O., lived at a different residence. He was given temporary custody of his biological children, J.O. and C.O., at the shelter hearing.
On or about September 14, 2005, the children's maternal grandmother advised the court that the father was dealing and using drugs in the home where the children were residing. On September 15, 2005, a modification of placement petition was filed, stating that the court ordered *396 removal of the children on September 14 when J.O. tested positive for cocaine and marijuana. The children were placed in temporary custody with their maternal grandmother. On September 26, 2005, the Department filed a dependency petition as to the father, which was later dismissed. No order was entered.
In a disposition hearing held on December 6, 2005, the trial court refused to return the children to their father because of his alleged drug use. The Department then filed a second petition for dependency against the father alleging the children were at risk of harm due to his alleged use of drugs, sale of drugs, and criminal record. On April 11, 2006, an adjudicatory trial was held as to the father. The court found both children dependent, but did not enter a final order. After several informal attempts to secure an adjudicatory order, the father filed a motion to compel entry of an adjudicatory order. On January 11, 2007, an adjudicatory order was rendered declaring the children dependent as to the father, which the father now appeals.
In a dependency proceeding, the allegations contained in the dependency petition must be established by a preponderance of the evidence. J.C. v. Fla. Dep't of Children & Family Servs., 937 So.2d 184, 186 (Fla. 3d DCA 2006). Additionally, a determination of dependency is a mixed question of law and fact and will be upheld on appeal if the trial court applied the correct law and its ruling is supported by competent substantial evidence. Id. See also A.B. v. Fla. Dep't of Children & Family Servs., 901 So.2d 324, 326 (Fla. 3d DCA 2005).
In the case before us, the trial court applied the correct law using the statutory definition of a dependent child as defined in section 39.01(14), Florida Statutes (2004), which provides, in pertinent part:
"Child who is found to be dependent" means a child who, pursuant to this chapter, is found by the court:
(a) To have been abandoned, abused, or neglected by the child's parent or parents or legal custodians;
. . .
(f) To be at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents or legal custodians.
In addition, the trial court found that the Department established by a preponderance of the evidence that the children lived in an environment where: 1) their father conducted the sale of drugs from inside of their home; and 2) their father was known throughout the community as "Mr. Black," a drug dealer. We thus conclude that the trial court applied the correct law concerning the childrens' dependency, and its ruling was supported by competent and substantial evidence.
Here, the testimony and evidence in the record demonstrates that the father conducted the sale of drugs on the property where the children lived and while they were present. We find our decision in J.C. v. Florida Department of Children & Family Services, 937 So.2d 184 (Fla. 3d DCA 2006), to be directly on point. In J.C., we held:
While there is no evidence that the children were present or even aware that their father was selling drugs from the structure within the curtilage and directly behind their home, and no evidence of violence, based upon the ages of the children (ten and a half, and seven years of age), the proximity of the drugs, the number of transactions, the fact that the transactions occurred throughout the day and evening, and the presence of an unsecured firearm within the home, we conclude that there was sufficient evidence to support the trial court's finding *397 that the children's physical and mental health were at substantial risk of imminent harm.
Id. at 187. Consequently, we conclude that there was sufficient evidence here to support the trial court's finding that the children's physical and mental health were at substantial risk of imminent harm. Accordingly, we affirm the trial court's order adjudicating C.O. and J.O. dependent as to their father.
Affirmed.
GERSTEN, C.J., and RAMIREZ, J., concur.
SHEPHERD, J., concurring dubitante.
Adherence to the doctrine of stare decisis requires me to join in the majority affirmance of the trial court's decision in this case. I write only to note how far adrift we continue to travel aboard the vessel, J.C. v. Fla. Dep't of Children & Family Servs., 937 So.2d 184 (Fla. 3d DCA 2006). In J.C., we announced the per se rule that anytime a parent sells drugs in the vicinity of his offspring, the right to remove the offspring attaches a fortiori. See id. Applying that rule, we found J.C.'s two children, D.C. and L.C., dependent as to him  a non-repentant, jailed, former drug-dealing father. Id. Today, we affirm a trial court decision keeping two other children, J.O. and C.O., from a repentant father about whom the undisputed testimony offered at trial was that he had turned his life around. This portion of the father's story is not chronicled in the majority opinion. So, first let me tell  as a legendary syndicated radio columnist might say  "the rest of the story."[1]
The majority affirms the dependency adjudication in this case on the ground that the children "were"  in the past  "at substantial risk of imminent harm." See supra p. 397. The evidentiary support for this conclusion, also found by the trial court, was the maternal grandmother's testimony regarding J.O.'s reputation in the community, and her testimony that prior to September 14, 2005, she observed "people coming in and out of the house" where J.O. lived with his children. The children were outside playing basketball or engaging in other activities at the time of her observations. The grandmother candidly admitted she never saw J.O. engage in a drug transaction in the home. J.O.'s mother, whose house J.O. and the children occupied, is, or was, a drug user. Although certainly not a model father, J.O. had substantially parented his son, J.O., for much of the seven years of his young life before the unfortunate shooting of his step-sibling at the children's mother's house, which brings us here.[2] He also has spent time with his daughter. As the grandmother testified, and the trial court acknowledged, J.O. "was" and "had the potential to be a good father."
What the majority fails to report is the undisputed testimony of J.O.'s sister, the only other witness who testified at the final hearing, that shortly after J.O.'s children were removed from his custody on September 14, 2005, J.O. left that home, *398 moved to his sister's house,[3] obtained a proper job, paid child support for his children for the first time, and for a period of at least three months before the final hearing on April 11, 2006, did not use or deal drugs. The trial court acknowledged this turnaround: "Now do I know if he is drug dealing today? No." Yet, the trial court continued:
Do I think he was drug dealing when the children lived with him? Yes, I do. I do. In fact, quite frankly, I have no doubt about it, and I find by a preponderance of the evidence that these children are at  were at risk at the time, and there is prospective risk now. I am going to adjudicate these children dependent as to him.
(emphasis added).
The Department too acknowledges the lack of any evidence of illegal activity by J.O. after September 14, 2005. The Department nevertheless argues that J.O.'s contention that the children therefore cannot be declared dependent as to him under Section 39.01(14)(f) of the Florida Statutes (2004), requiring dependent children "to be at substantial risk of imminent abuse, abandonment, or neglect" to justify an adjudication, "is fallacious based upon his ability to move from his sister's home, and create another drug dealing environment to p[l]ace his children[ ]" (emphasis added). That is, of course, possible  but it is just as possible that J.O. has irrevocably decided, for his own reasons, to turn his life to the better for the benefit of his children.[4] I do not find the Department's asserted "possibility" sufficient to support an adjudication under this state's dependency laws.
Dependency adjudications in this state are a matter of statutory law. Chapter 39 of the Florida Statutes defines a "dependent" child as one who is found by the court to have been abandoned, abused or neglected by his or her parents or one who is "at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents. . . ." § 39.01(14)(a), (f), Fla. Stat. (2004). As recently stated by one of our sister courts, "[i]n order to support an adjudication of dependency the parent's harmful behavior must be a present threat to the child." B.C. v. Dep't of Children & Families, 846 So.2d 1273, 1274 (Fla. 4th DCA 2003) (emphasis added). Therefore, "before we can affirm [a] trial court's adjudication of dependency, we must either find: competent, substantial evidence that the child was abandoned; competent, substantial evidence that the child was abused; competent, substantial evidence that the child was neglected; or the risk of abandonment, abuse or neglect is imminent." J.B.M. v. Dep't of Children & Families, 870 So.2d 946, 949 (Fla. 1st DCA 2004). The adjudication in this case is not sustainable on the basis of actual abuse, abandonment, or neglect within the meaning of Section 39.01(14)(a). If it is sustainable at all, the adjudication must rest upon the existence of a present or "imminent risk" to the children within the meaning of Section 39.01(14)(f) of Florida's dependency statute.
It is also clear in the absence of actual abuse, abandonment, or neglect by a parent, *399 "the mere possibility of future abuse, neglect, or abandonment will not support a finding of dependency." R.S. v. Dep't of Children & Families, 881 So.2d 1130, 1135 (Fla. 4th DCA 2004). This legal truth is derivable from the language of the relevant sections of Chapter 39. Dependency adjudications based upon actual abuse, abandonment, or neglect by a parent or legal custodian are governed by Section 39.01(14)(a). A dependency adjudication lies under this section of the Florida statutes whenever a child is found "[t]o have been abused, abandoned, or neglected. . . ." § 39.01(14)(a), Fla. Stat. (emphasis added). In these circumstances, the Department need not inquire into or offer proof of present household circumstances. The statutory misfeasance is alone sufficient. See id.
By contrast, Section 39.01(14)(f) allows an adjudication of dependency where a child is found "[t]o be at substantial risk of imminent abuse, abandonment, or neglect. . . ." § 39.01(14)(f), Fla. Stat. (emphasis added). This language directs the necessity of a continuing risk  not just a risk that existed sometime in the past, but a risk that is alive and merits judicial interference in the parent-child relationship to protect the child's welfare. Therefore, in an imminency case, such as we have here, the issue is not whether a resumption of prior risky behavior is possible, but whether "future behavior will adversely affect the child and can be clearly and certainly predicted." In re P.S. v. Dep't of Children & Family Servs., 825 So.2d 530, 531 (Fla. 2d DCA 2002) (emphasis added); J.C. v. Dep't of Children & Families, 773 So.2d 1220, 1222 (Fla. 4th DCA 2000) (holding that a possibility of future harm does "not rise to the level of injury `likely to cause the child's physical, mental, or emotional health [to] be significantly impaired[ ]'") (emphasis added); Palmer v. Dep't of Health & Rehab. Servs., 547 So.2d 981, 984 (Fla. 5th DCA 1989); see also Nicholson v. Scoppetta, 3 N.Y.3d 357, 369, 787 N.Y.S.2d 196, 820 N.E.2d 840 (2004) ("Imminent danger . . . must be near or impending, not merely possible."). The Department does not argue the existence of any "impending" or probable, or present danger to these children on the record presented. The trial court adjudicates and we affirm on the basis of past conduct. The natural workings of J.C., 937 So.2d at 184, compel this result, leaving me checkmated by precedent. I nevertheless pause to record my continued reservation that proof of past conduct, without more, is sufficient to support an imminency adjudication.
NOTES
[1] See generally Paul Harvey, Paul Harvey's the Rest of the Story (1978). Harvey, a syndicated radio personality who began his career in 1933, during one phase of his career hosted a program called "The Rest of the Story" in which he delved into forgotten or little-known facts behind stories.
[2] As the majority states, the childrens' father and mother lived apart. The shooting occurred at the childrens' mother's home. Although the record is not clear, there is evidence that J.O. and C.O. may well have just been visiting their mother, rather than living there, at the time of the shooting.
[3] The sister testified she lives in Section 8 housing and does not tolerate drugs in her home. In the late 1980's, she took a sibling from the court system, raised her, and had her in her second year of college at the time of the final hearing. She also had a daughter of her own just heading to college. In response to a question about what she would do if J.O. were to use or sell drugs while staying in her home, she said she would "[p]ut him out."
[4] The childrens' mother has been jailed for felony child abuse as a result of the sibling shooting.