SHEPHERD, J.
 

 This is a parents’ appeal of a trial court adjudication of dependency on the ground of neglect.
 
 See
 
 § 39.01 (14)(a), Fla. Stat. (2007). The applicable statutory definition of “neglect” upon which the Florida Department of Children and Families filed its petition and the court relied, provides “ ‘[njeglecf ” occurs when a child ... is permitted to live in an environment when such ... environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.”
 
 See
 
 § 39.01(43), Fla. Stat. (2007). By this appeal, the Department invites us to expand the definition of the “environment” in which a child “lives”— for purposes of attaining adjudications pursuant to this subsection of Florida’s dependency laws — beyond the limits to which we have heretofore expanded them: the child’s residence,
 
 see J.O. v. Dep’t of Children & Family Servs.,
 
 970 So.2d 395 (Fla. 3d DCA 2007), and the curtilage surrounding the residence,
 
 J.C. v. Fla. Dep’t of Children & Family Servs.,
 
 937 So.2d 184 (Fla.2006). We decline the invitation. A brief recitation of the facts and procedural history of this case is necessary to explain our decision.
 

 FACTS AND PROCEDURAL BACKGROUND
 

 This is a two parent dependency proceeding. Both the father, R.S., and the mother, Y.S., appeal their respective adjudications. Since January 2007, the mother and father have lived separately. R.S., Jr., then seven-years old, followed the mother to her new residence.
 

 The factual grounds for the trial court’s finding of neglect in this case are based
 
 *950
 
 upon circumstances at the father’s house, the former marital residence, on May 31, 2007. The house is located immediately across the street from the child’s school. In the early afternoon that day, City of Miami police executed an arrest and search warrant on the father for sale of cocaine within 1000 feet of a school zone and possession of cocaine as he drove into his driveway. The mother and the child, who were inside the house, witnessed the arrest.
 
 [1]
 
 The father explained that he was just returning with some food for the mother and the son. Approximately two hours later, the mother, still at the home, was arrested for the same crimes. Six days later, the Department received an abuse report — presumably from the City of Miami Police Department — recounting the events of May 31.
 

 Two months later, on July 27, 2007, the Department took action by filing a verified shelter petition, alleging the mother “has placed the minor child ... at risk of neglect ... by allow[ing] the child to live in an environment that placed the child’s physical mental and/or emotional health to be in danger of being significantly impaired” in violation of section 39.01(43) of the Florida Statutes (2007). The environment described in the petition was the father’s home. The petition alleged that “both parents are placing the children at imminent risk of harm by allowing the child to reside in such environment .... ” (emphasis added). The record reflects that only two individuals were present at the shelter hearing held on that date, an attorney for the Department, and Child Protection Investigator Laverne Sumpter. At the conclusion of the hearing, the child was ordered to be retrieved and placed with an aunt.
 

 A few days after that, on August 2, 2007, Sumpter found the mother and the child at the father’s home. The mother testified she was securing some of the father’s belongings due to the fact he was incarcerated, and the area was the subject of numerous break-ins and burglaries. Sumpter interviewed the mother, but she did not ask the mother where she lived or what she was doing at the father’s house. Although obviously aware of the shelter order, she did not take the child, or, so far as the record before us reveals, arrange for the child to be retrieved. Instead, she gathered the information she wanted, and left.
 

 Five days later, on August 7, 2007, the Department filed its Verified Petition for Dependency. The Department again alleged the child was neglected within the meaning of section 39.01(43). The source of the illegal activities alleged emanated from the events of May 31, 2007, at the father’s house.
 

 The adjudicatory hearing on the petition was held on January 16, 2008. Several witnesses testified, including Adria Silver-man, the licensed clinical social worker assigned to the case. Her investigation revealed the mother and the father indeed separated in January 2007. She further testified the mother moved in with other family members at that time. The mother confirmed that as of January 2007, she and the child did not live with the father. According to the mother, she left the father because he was “cheating on me and stuff.” The father agreed that by that date he and his wife were “having some
 
 *951
 
 problems ... so she moved out.” Neither the Department nor the trial court dispute the mother and the child have not resided at the father’s house since January 2007.
 

 On the other hand, as correctly observed by the trial court, the father “had frequent contact with his son” after the parents separated. As previously stated, the child’s school was directly across the street from the father’s house. The home into which the mother and the child moved after leaving the father was just a couple of blocks from there. The child’s friends remained in the neighborhood, and one, not coincidentally, lived next door to where the child used to live. On the other hand, the mother had given strict orders that the child should not enter the father’s house. As the father testified, the child “didn’t come over here because she wouldn’t allow him to come there, so I had to go over there and see him.”
 
 [2]
 
 As the trial court recognized in its written findings, the mother’s orders apparently stuck. Except for “a couple of occasions,” said the trial court, there was no testimony the child entered the house with or at the instance of the father. According to the mother, the two of them “[would] go to the park, movies, McDonald’s, stuff like that.” Although no angel — the arresting police officers testified that on the day of the arrest they found marijuana on top of the refrigerator in the father’s house, twenty-two baggies of rock cocaine in a dresser drawer, $3600 in a safe, and a revolver under a bed located in the living room — the father apparently had some interest in parenting the child.
 

 Six days after completion of the trial testimony, on January 22, 2008, the trial court entered an order on judicial review, finding “mother is compliant with parenting, substance abuse evaluation, individual therapy, and employment.” Three weeks later, on February 12, 2008, the trial court ordered the release of the child to the mother’s care, noting, “it is in the best interest of the child to be placed with the mother. There was a positive home study on the mother’s home.”
 

 Nevertheless, on March 7, 2008, the trial court entered an adjudicatory order determining the child to be “at present and prospective risk of neglect or abuse.” All of the findings of fact found by the trial court for its decision related to the father’s activities and the father’s house. Specifically, the court found: (1) the father “brought his son on occasion to his home”; (2) cocaine, cash, and an unsecured firearm were found in the father’s home; and, (3) the child was “present at the Father’s house on the day of the parents’ arrest, went to school within 25 feet of the Father’s home, and frequently visited his friend next door to his Father’s home on a regular basis.” Candidly recognizing it was expanding the reach of the case law relating to “neglect” under section 39.01(43), the trial court concluded:
 

 Pursuant to
 
 J.O. v. [Dep’t of Children & Family Servs.],
 
 970 So.2d 395 (Fla. 3[d] DCA 2007),] and
 
 J.C. v. [Dep’t of Children & Family Servs.],
 
 937 So.2d 184, 187 (Fla. 3[d] DCA 2006), “the sale of drugs on the property of where children live [ ] and while they are present constitutes a substantial risk of neglect and/or imminent abuse.” This is especially true where, as in
 
 J.C.,
 
 an unsecured firearm is present in the home.
 

 The court made no specific findings as to the mother.
 

 
 *952
 
 We conclude the trial court unlawfully expanded the reach of the case law of “neglect.”
 

 ANALYSIS
 

 The resolution of this case requires that we explore the meaning and breadth of the phrase “live in an environment” as it appears in the definition of “neglect” in section 39.01(43). The phrase appears as follows in context:
 

 “Neglect” occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment or a child is permitted to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.
 

 § 39.01(43) (emphasis added).
 
 [3]
 

 In performing our analysis, the Department would have us place our primary focus on the word “environment” in section 39.01(43). Focusing on this word, the Department argues the environment in which the child lives must include broadly “the totality of the child’s exposure.” We do not believe the phrase “live in an environment” can be interpreted so broadly. Rather, we are of the opinion that the focus should be on the word “live.” Although the word “live,” is not defined in section 39.01, we believe those who come within the purview of the statute would readily understand the word “live” and the phrase “live in an environment,” based upon ordinary meaning and common experience, to mean the environment or place where a person actually resides. Our conclusion is supported both by reference to the dictionary,
 
 see Black’s Law Dictionary
 
 842 (5th ed. 1979) (“Live,” v. “To live in a place, is to reside there, to abide there, to occupy as one’s home.”) (emphasis added), and the fact that in its initial filing in this case on July 27, 2007, the Department itself used the term “reside” in substitution for the word “live,” in making allegations relating to where the child lived for purposes of section 39.01(43). Finally, our interpretation is consistent with a similar statute in at least one other jurisdiction we have located.
 
 See
 
 N.C. Gen.Stat. § 7B-101(15) (2009) (defining “neglected juvenile” and interpreting one who “lives in an environment” as one who “lives in a home”).
 

 In this case, it is undisputed the child did not reside at the father’s house at any time relevant to the consideration and adjudication of this case. Nevertheless, the trial court, remarking the child: 1) “went to school within 25 feet of the Father’s home”; 2) “visited his friend next door”; 3) visited the father’s house “on occasion”; and 4) “was present at the Father’s house on the day of the parents’ arrest,” adjudicated the child dependent on the state as to both the father and the mother. We conclude these findings are insufficient as a matter of law to uphold an adjudication of dependency as to either the mother or the father on the legal ground presented in the petition for dependency. We decline to extend the reach of section 39.01(43) beyond the place of actual residence of the child,
 
 see J.O.,
 
 970 So.2d at 395, and the curtilage surrounding the actual place of residence,
 
 see J.C.,
 
 937 So.2d at 184.
 

 
 *953
 
 For these reasons, we reverse the adjudication of dependency as to both the father, R.S., and the mother, Y.S., in this case.
 

 Reversed.
 

 [1]
 

 . The evidence was conflicting on whether the son was with the mother on that date. The mother and father testified he was across the street at a school program. The arresting officer testified he saw a young boy in the house when he arrested the father. The arrest report did not record the presence of the child. The trial court found the child was present.
 

 [2]
 

 . When the father was asked if he knew why the mother did not like for the child to go to the father’s house, the father responded, "[S]he heard through the grapevine that I'm engaging in some negativity ... so she said she [didn’t] want to ... be involved in it. But she didn't really know what I was doing....”
 

 [3]
 

 . We treat this issue before us de novo.
 
 See State v. Glatzmayer,
 
 789 So.2d 297, 301 n. 7 (Fla.2001) (stating that if the ruling in a dependency proceeding consists of a pure question of law, the ruling is subject to de novo review).
 
 See also
 
 Philip J. Padovano,
 
 Florida Appellate Practice,
 
 § 18.4 (2009 ed.).